706 A.2d 721

ANGELA MORLINO, INDIVIDUALLY AND ANGELA MORLINO, ADMINISTRATRIX AD PROSEQUENDUM FOR THE ESTATE OF BABY GIRL MORLINO, DECEASED, PLAINTIFF–APPEL-LANT, v. MEDICAL CENTER OF OCEAN COUNTY, J. DUGE-NIO, M.D. AND FLAVIUS THOMPSON, M.D., DEFENDANTS–RESPONDENTS, AND JOHN DOE, M.D., THE EMERGENCY ROOM PHYSICIAN(S), JANE DOE, R.N., THE EMERGENCY ROOM NURSE(S) AND JOHN DOE II, M.D., DEFENDANTS.

Argued November 3, 1997—Decided February 26, 1998.

564

*Robert B. Kurzweil,* argued the cause for appellant (*Katz, Ettin, Levine, Kurzweil & Weber,* attorneys).

*Joseph A. DiCroce,* argued the cause for respondent Medical Center of Ocean County (*DiCroce & Maggs,* attorneys; *Timothy J. Wintrode,* on the brief).

*Martin J. McGreevy,* argued the cause for respondent J. Dugenio, M.D. (*Carton, Witt, Arvanitis & Bariscillo,* attorneys; *Russell J. Malta,* on the briefs).

*John R. Orlovsky,* argued the cause for respondent Flavius Thompson, M.D. (*Orlovsky, Moody, Schaaff & Gabrysiak,* attorneys; *Mr. Orlovsky* and *Paul F. Schaaff, Jr.,* on the briefs).

*Michael S. Berger,* argued the cause for *amicus curiae* Association for Trial Lawyers of America–New Jersey (*Mr. Berger,* attorney; *Kevin Haverty,* on the brief).

*Hugh Francis,* argued the cause for *amicus curiae* American Insurance Association (*Francis & Berry,* attorneys; *Peter A. Olsen,* on the brief).

*Herbert J. Stern,* submitted a brief on behalf of *amicus curiae* the Medical Society of New Jersey (*Stern & Greenberg,* attorneys; *Joel M. Silverstein,* on the brief).

The opinion of the court was delivered by

POLLOCK, J.

This medical malpractice case presents two issues. The first is whether pharmaceutical package inserts in the Physicians Desk

Reference (PDR) are admissible as evidence of a physician's standard of care. The second issue is whether the trial court committed reversible error by instructing the jury in accordance with Model Jury Charge 5.36(A) that a physician is not liable for diagnosis or treatment resulting from the exercise of the physician's judgment.

When she was eight and one-half months pregnant, plaintiff, Angela Morlino, visited the emergency room at the Point Pleasant facility of defendant Medical Center of Ocean County (Medical Center) complaining of a sore throat. Dr. J. Dugenio, the emergency room doctor, prescribed Ciprofloxacin (Cipro). A sonogram on the following day revealed that Morlino's fetus was dead.

Morlino sued Dr. Dugenio, the Medical Center, and her obstetrician, Dr. Flavius Thompson. Claiming that the ingestion of Cipro had caused the fetus's death, Morlino sought damages for severe emotional distress.

The trial extended over three weeks. After deliberating for less than an hour, the jury returned a unanimous verdict in favor of defendants.

The Appellate Division held that a PDR warning is admissible in conjunction with expert testimony to establish the appropriate standard of care. The court also held that proof of a violation of a warning in the PDR is not *prima facie* evidence of negligence. 295 *N.J.Super.* 113, 122–23, 684 *A.2d* 944 (App.Div.1996). It concluded, however, that the trial court's failure to admit the PDR warning was harmless error. *Id.* at 126, 684 *A.2d* 944.

Finally, the Appellate Division upheld the trial court's reliance on Model Jury Charge 5.36(A)'s "exercise of judgment" instruction. *Id.* at 129, 684 *A.2d* 944.

We granted certification, 149 *N.J.* 34, 692 *A.2d* 47 (1997), and now affirm the judgment of the Appellate Division.

## I.

### A.

On March 5, 1990, four weeks before she was due to deliver her baby, Morlino visited the emergency room of the Medical Center. She was diagnosed with "acute pharyngitis," commonly known as a sore throat, and was given a prescription for 500 milligrams of amoxicillin, an antibiotic in the penicillin family.

Morlino returned to the emergency room of the Medical Center on March 20. She again sought treatment for a sore throat. Dr. Dugenio took her history, examined her, and diagnosed her condition as acute pharyngitis. He also ordered a variety of tests. Blood and sedimentation tests indicated an infection or inflammation. Dr. Dugenio believed that a bacteria known as Hemophilus influenza was causing Morlino's acute pharyngitis.

Two days later, the results of Morlino's throat culture confirmed the presence of Hemophilus influenza bacteria. The culture also revealed that Morlino's infection was resistant to numerous antibiotics such as ampicillin, cephalosporin, erythromycin, clindamycin, nafcillin, and penicillin.

Even before receiving the throat culture results, Dr. Dugenio considered prescribing Cipro. He consulted the PDR, a compilation of information about prescription drugs that is published annually and distributed to the medical professional free of charge. A typical entry includes the trade and chemical names of the drug, a description of the drug, indications and contraindications for its use, warnings, adverse reactions, administrations and dosage, and information on managing and adjusting the dosage of the drug. *Ramon v. Farr*, 770 P.2d 131, 133 n. 2 (Utah 1989). Generally, the information in a package insert, which accompanies prescription drugs, is the same as that in the PDR.

The PDR contains the following warning for Cipro:

CIPROFLOXACIN SHOULD NOT BE USED IN CHILDREN OR PREGNANT WOMEN. The oral administration of ciprofloxacin caused lameness in immature

dogs. Histopathological examination of the weight-bearing joints of these dogs revealed permanent lesions of the cartilage.

Additionally, the PDR characterizes drugs for pregnant women based on the degree to which the drug manufacturer has ruled out a risk to the fetus. Cipro was in "Use–In–Pregnancy Category C," which means:

Risk cannot be ruled out. Human studies are lacking, and animal studies are either positive for fetal risk, or lacking as well. However, potential benefits may justify the potential risk.

From the PDR warnings, Dr. Dugenio understood that he should prescribe Cipro for a pregnant patient only if the potential benefit to the patient outweighed the risk to her and the fetus. In weighing the risks and benefits, Dr. Dugenio was concerned that the Hemophilus influenzae bacteria, if untreated, could lead to more serious illnesses, such as infectious mononucleosis, pneumonia, and meningitis. These illnesses could pose serious risks to Morlino and her fetus. The PDR, he noted, did not state that the use of Cipro in pregnant women is contraindicated.

Dr. Dugenio described his decision-making process:

After analyzing the situation with the patient and the potential risk that she may have, based upon my previous experience with this kind of problem, Cipro was the medication that I know of that can possibly do the job as far as the possible infection that I thought this patient had, which turned out to be correct after the culture, anyway.

I considered giving her the ampicillin [sic] that was given on the 5th of March, but I found out that this, in all likelihood, will not kill the bacteria, because the patient came to the emergency room again. It stands to reason.

Next I was considering the other medications in similar category, like keflex, but these are similar to ampicillin, and in my experience, even to myself now, when I take this medication, it does not work, and it does not work for so many of my patients in the emergency room of a similar condition.

So I elected to give the Cipro, because I know in my heart it will work, and it does work for me and it does work for the other patients, knowing the risk, the possible risk. But see, the patient's risk far outweigh the risk, the potential risk, that it would harm as far as the warning's concerned.

That warning, it doesn't mean that because it's there, it's going to happen. It may happen, but it does not necessarily have to happen.

But I can tell you one thing, if my—my potential, especially of this patient, of possibility of an infection of Hemophilus influenzae variety, which can cause sudden closing of the throat, which is a major cause of meningitis in children five years or

under, I'm not going to give anything less that Cipro, because I know it's going to work.

Dr. Dugenio did not warn Morlino that Cipro might pose a risk to her fetus. He gave her a 500 milligram Cipro pill and a prescription for 250 milligrams of Cipro to be taken twice a day.

Missing from the abbreviated record before us is Morlino's testimony. The record nonetheless reflects conflicts that could have affected the jury's assessment of Morlino's credibility.

According to both Dr. Dugenio and Morlino, Morlino arrived at the emergency room on March 20, 1990 at 10:59, took the Cipro at 12:30, and was discharged ten minutes later. The parties' testimony differed on whether Dr. Dugenio saw Morlino at the emergency room in the morning or the evening of March 20, 1990. In her deposition, Morlino testified that she had sought treatment during the evening of March 20–21. According to the hospital records, however, Morlino was treated in the emergency room from 10:59 a.m. to 12:30 p.m. on March 20, 1990. In his testimony, Dr. Dugenio confirmed the accuracy of the hospital records. Moreover, the hospital's planning calendar and the physician's sign-in sheet both indicate that Dr. Dugenio worked from 8 a.m. to 8 p.m. on March 20. Finally, Morlino filled her prescription for Cipro at a local pharmacy on March 20, not March 21. If, as Morlino testified in her deposition, she did not leave the emergency room until March 21, she could not have filled the prescription on March 20.

At her deposition, Morlino further testified that she drove home from the hospital at night. She stated that while driving, she felt dizzy, weak, and short of breath and that her eyesight was blurred. Morlino testified that she lost consciousness for several hours when she returned to her home.

On March 21, 1990, Morlino's obstetrician, Dr. Thompson, was unable to detect a fetal heartbeat during a routine examination. A sonogram revealed that Morlino's fetus had died. During the course of his examination, Dr. Thompson called the Ocean County emergency room and ascertained that she had taken Cipro. After

reviewing the PDR entry for Cipro, Dr. Thompson concluded that it could not have caused the death of the fetus. The autopsy of the fetus did not reveal any arthropathy (joint cartilage damage), the subject of the PDR warning.

The expert testimony was in sharp conflict. Dr. Steven Clark, an expert in obstetrics and maternal/fetal medicine, testified on behalf of Morlino. Referring to the warnings in the PDR, he asserted that Dr. Dugenio had violated the applicable standard of care by administering Cipro to Morlino. According to Dr. Clark, Cipro should not be prescribed for a pregnant woman unless she is critically ill and all other antibiotics had failed. He explained that Cipro can cause arthropathy in the joints of a fetus. Dr. Clark nonetheless admitted that the fetus's joints did not reveal any arthropathy. He acknowledged, moreover, that a Class C drug, such as Cipro, can be prescribed for a pregnant woman if the potential benefits outweigh the risks. In his opinion, however, the risk/benefit analysis for Mrs. Morlino was "absolutely on the side of: don't give Cipro...."

According to Dr. Clark, the dose of Cipro given at the hospital had caused Morlino, while driving home at night, to suffer a severe allergic reaction, known as anaphylaxis. Dr. Clark believed that the anaphylactic reaction caused the fetus's death. He admitted, however, that anaphylactic reactions among persons taking Cipro are "very rare" and that it was equally likely that Morlino could have sustained an anaphylactic reaction to any other antibiotic. Dr. Clark also acknowledged the absence of any known cases of anaphylaxis from the administration of Cipro to pregnant women.

According to Dr. Clark, an anaphylactic reaction to an antibiotic is almost instantaneous. Critical to Dr. Clark's testimony was Morlino's version of the facts that she had taken the Cipro at 12:30 a.m. on March 21. He conceded that, if Morlino had ingested the drug at 12:30 p.m. on March 20, not at 12:30 a.m. on March 21 as she claimed, the "reaction" she experienced was not connected to Cipro.

Morlino also presented the expert testimony of Dr. Chester Smialowicz, an infectious disease specialist. Dr. Smialowicz testified that the PDR instructs that Cipro should not be given to a pregnant woman unless the mother's life is at risk and no safer antibiotic will help. Like Dr. Clark, he testified that Dr. Dugenio had deviated from the accepted standard of care by giving a pregnant woman Cipro for a sore throat.

According to Dr. Smialowicz, Hemophilus influenzae, which is found normally in a person's throat, does not cause acute pharyngitis. In his opinion, Morlino did not require an antibiotic. Dr. Smialowicz testified that Cipro yields only a negligible effect on upper respiratory infections and was of no benefit in the treatment of Morlino's acute pharyngitis. Acute pharyngitis, according to Dr. Smialowicz, is a superficial irritation. Consequently, Dr. Dugenio should not have been concerned that Morlino was at risk for acute epiglottis, meningitis, bronchitis, or pneumonia. Finally, Dr. Smialowicz believed that even if the cause of Morlino's pharyngitis was bacterial, the preferred treatment would have been a form of penicillin.

Two experts testified on behalf of Dr. Dugenio. Dr. Sidney Wilchins, an obstetrician and gynecologist, contradicted Morlino's experts. Dr. Wilchins testified that Dr. Dugenio had complied completely with the accepted medical standard of care. According to Dr. Wilchins, it was "totally appropriate" for Dr. Dugenio to prescribe Cipro for three reasons. First, amoxicillin had not cured Morlino's March 5 sore throat. Therefore, it would had been useless to continue with the penicillin family of antibiotics. Second, Dr. Dugenio could not use a tetracycline because of the risk of fetal tooth discoloration.

Third, Dr. Wilchins emphasized the importance of weighing the comparative consequences of treating and not treating the patient. Unlike Dr. Smialowicz, Dr. Wilchins stated that Hemophilus influenzae can cause acute pharyngitis. Indeed, the throat culture confirmed bacteria as the cause of Morlino's sore throat. Because Hemophilus influenzae can cause meningitis and pneumonia, the

risk of not treating Morlino's infection was "infinitely catastrophic" to the fetus as opposed to treating the infection. Hence, the floxacin family, which includes Cipro, was "a logical choice."

Dr. Wilchins reasoned that Cipro was unrelated to the fetus's death. First, the fetus's death was most likely caused by the length of Morlino's umbilical cord. The average length of umbilical cords is fifty-five to sixty-five centimeters. Morlino's umbilical cord, however, was approximately thirty-six to thirty-eight centimeters. Thus, Dr. Wilchins reasoned that the cause of the fetus's death was "short cord syndrome." Second, Dr. Wilchins noted the absence of any recorded history indicating that a single dose of Cipro is causally connected to a stillbirth.

Third, he rejected Dr. Clark's theory that Cipro caused Morlino to suffer anaphylactic shock. In brief, Dr. Wilchins emphasized the significance of the time lapse between Morlino's ingestion of Cipro and her claimed anaphylactic shock. According to Dr. Wilchins, anaphylactic reactions occur "automatically, virtually, immediately, upon exposure of the medication." If Morlino had suffered a reaction during the evening of March 20 and ingested only one dose of Cipro at 12:30 p.m. on that date, then her reaction was unrelated to Cipro. For Cipro to have had a causal connection with anaphylaxis, Morlino's reaction would have occurred between 12:30 and 12:40 p.m., not eight hours later.

Finally, Dr. Wilchins referred to the PDR, which "specifically refers to Ciprofloxacin causing lameness in immature dogs: This [case] has nothing to do with cartilage. There's nothing in this case, going back to all reports of the fetus, that in any way refers to any abnormality involving cartilage. So automatically there was no association."

Dr. Julius Kaplan, an emergency-medicine physician, also testified for the defense. Dr. Kaplan stated that Dr. Dugenio's care, including the administration of Cipro, comported with the accepted standard of care for emergency room physicians. Dr. Kaplan noted that Dr. Dugenio followed each step required of an emergency room physician: he obtained an appropriate patient history,

conducted a physical examination, ordered ancillary tests, made a diagnosis, and made the appropriate disposition by prescribing medication.

Dr. Kaplan decided that Cipro was an appropriate antibiotic. He supported his decision by reasoning that two weeks earlier Morlino had taken "a first-line drug," amoxicillin, and still had a sore throat. Under those circumstances, Dr. Kaplan testified, "it's perfectly appropriate for a physician to use medical judgment, to then give the patient a more potent antibiotic, a stronger antibiotic." Prescription of an antibiotic from the penicillin family, therefore, would have been inappropriate.

In Dr. Kaplan's opinion, Morlino suffered from both viral and bacterial infections. Accordingly, Dr. Dugenio properly prescribed an antibiotic to treat the bacterial infection. Furthermore, Dr. Kaplan explained that hemophilus influenzae can cause not only acute pharyngitis, but also ear infections, pneumonia, sepsis, and is "one of the most serious causes of meningitis." Such diseases pose potential risks to a fetus. For example, a sepsis infection could either cross the placental barrier and affect the fetus directly or, more likely, debilitate the mother to the point where the fetus was stressed.

Finally, Dr. Kaplan did not believe that Morlino had suffered an anaphylactic reaction. Although antibiotics can cause anaphylactic shock, such shock is rare. Pointing to the time lapse between the administration of the drug at 12:30 p.m. on March 20 and the onset of symptoms in the evening, Dr. Kaplan stated, "It is inconceivable, in my opinion, that any reaction which happened in the evening hours could have been related to taking a pill at 12 o'clock noon or somewhere around there."

Although this appeal focuses on legal issues, Dr. Dugenio argues "that [Morlino's] theory that the fetal death was caused by an anaphylactic shock was seriously challenged. The credibility of this thesis relied to a great extent upon the credibility of testimony given by [Morlino]. During the course of the trial [Morlino's] credibility was seriously eroded, if not completely destroyed."

When assessing Morlino's credibility, the jury, for example, may have considered the inconsistency between her testimony and the controverted facts about the date on which she ingested Cipro, as well as other contradictions in her testimony.

### B.

To establish the standard of care concerning the prescription of Cipro, Morlino's counsel submitted requests to the trial court concerning the use of warnings in the PDR. Morlino also requested an instruction modifying Model Jury Charge 5.36(A), which pertains to the role of judgment in the practice of medicine. The trial court denied each request.

In affirming, the Appellate Division held that the trial court did not err by refusing to read verbatim that part of the two PDR warnings stating that Cipro should not be used by pregnant women and that the "[r]isk cannot be ruled out." The Appellate Division identified three approaches concerning the use of the manufacturer's insert and the parallel PDR warning to establish a medical standard of care. 295 *N.J.Super.* at 120–21, 684 *A.*2d 944. The first approach, adopted by this Court in *Sanzari v. Rosenfeld*, 34 *N.J.* 128, 140, 167 *A.*2d 625 (1961), "is that product packaging inserts do not establish a standard of care but are admissible to show what the physician knew or should have known about the drug." 295 *N.J.Super.* at 120, 684 *A.*2d 944. According to the Appellate Division, out-of-state cases support two other approaches. "The second approach is to allow product inserts (and the PDR) into evidence to show the standard of care, provided expert testimony is also presented to explain the standard of care to the jury." *Ibid.* The third approach "is that the product insert, standing alone without expert testimony, is evidence of negligence by the physician who fails to adhere to its rules." *Id.* at 121, 684 *A.*2d 944. Rejecting the first and third approaches, the Appellate Division adopted the rule that package inserts and their parallel PDR references may be considered by the jury along with expert testimony to determine the appropriate standard of care. *Id.* at

123, 684 *A*.2d 944. Nevertheless, the Appellate Division found no error in the trial court's refusal to instruct the jury that it could consider the PDR references, along with expert testimony, to define the standard of care. *Id.* at 125, 684 *A*.2d 944.

Next, the Appellate Division expressed its "dissatisfaction" with the trial court's use of Model Jury Charge 5.36(A)'s "exercise of judgement" instruction for three reasons. *Id.* at 127, 684 *A*.2d 944. First, it criticized the sentence "[t]he physician cannot be held liable if, in the exercise of his judgment, he nevertheless made a mistake." The sentence suggested that an "honest, good-faith exercise of judgment alone insulates a physician from liability." *Ibid.* Second, the Appellate Division reasoned that the charge's repetitive use of "judgment" has the "clear capacity to muddle the jury's understanding" of whether the physician met the standard of care. *Ibid.* Finally, the Appellate Division noted that courts in other jurisdictions have rejected "exercise of judgment" charges. *Id.* at 128, 684 *A*.2d 944.

The Appellate Division, however, declined to reverse the judgment for defendants because the Model Charge followed the statement in *Schueler v. Strelinger*, 43 *N.J.* 330, 344–45, 204 *A*.2d 577 (1964). *Id.* at 129, 684 *A*.2d 944. It noted that any shortcomings in the charge did not prejudice Morlino, given the compelling evidence that Dr. Dugenio conformed to prevailing medical standards by carefully weighing the risk of administering Cipro against its benefits. *Ibid.*

## II.

At the close of evidence, Morlino submitted Requests to Charge. Request No. 9 related to the medical standard of care. Morlino requested the trial court to charge verbatim two warnings in the PDR: first, that Cipro should not be used in pregnant women, and second, that the risk to the human fetus from Cipro could not be ruled out. Morlino further requested the trial court to instruct the jury that, if Dr. Dugenio knew of the warnings pertaining to pregnant women and nonetheless violated those warnings, such a

violation was evidence of negligence. Specifically, the proposed instruction stated in part:

You may find that such violation constituted negligence on the part of a defendant, or you may find that it did not constitute such negligence. Your finding on this issue may be based on such violation alone, but in the event that there is other or additional evidence bearing upon that issue, you will consider such violation together with all such additional evidence in arriving at your ultimate decision as to [the] defendant's negligence.

The trial court refused, ruling that the PDR was relevant only to Dr. Dugenio's knowledge of the warnings, and not to the standard of care pertaining to his treatment of Morlino.

The Appellate Division held, however, that the trial court should have instructed the jury to consider the PDR references as explained by the expert testimony as evidence of Dr. Dugenio's satisfaction of the appropriate standard of care. Nevertheless, the Appellate Division affirmed the judgment for defendants, holding further that the trial court's failure to so instruct the jury was harmless error. 295 *N.J.Super.* at 125, 684 *A.*2d 944.

The Appellate Division reasoned that the jury undoubtably considered the PDR warnings concerning the issues not only of Dr. Dugenio's knowledge, but also of the standard of care. *Ibid.* The court noted that the jury viewed "blow-ups" of the PDR's relevant sections and heard extensive expert testimony concerning the PDR. Morlino's experts testified about the PDR warnings and their opinion concerning the prescription of Cipro. The experts relied, in part, on the PDR to establish the standard of care and to describe the risk/benefit analysis required for Category C drugs. Also, Dr. Dugenio admitted that he had learned from the PDR not only of the risks of giving Cipro to a pregnant woman, but also of the necessity for a risk/benefit analysis. As the Appellate Division stated, the PDR "merely embodied the warnings and risk/benefit analysis which were addressed extensively by the experts." 295 *N.J.Super.* at 125, 684 *A.*2d 944.

Additionally, the trial court did not give a limiting instruction on the use of the PDR. It merely instructed the jury that it could consider the testimony of all witnesses, records, exhibits, docu-

ments, and depositions in reaching the verdict. The court did not instruct the jury to consider the PDR only in relation to Dr. Dugenio's knowledge. Accordingly, the jury was free to consider the warnings in the PDR with respect to any matter at issue in the trial.

Moreover, the trial court instructed the jury on how to weigh the expert testimony. It reminded them that the "value or weight of the opinion of the expert is dependent upon and is no stronger than the facts upon which [the expert] bases that opinion."

In sum, we agree with the Appellate Division that the jury was free to consider the PDR warnings on questions of both Dr. Dugenio's knowledge and the standard of care applicable to his conduct. We further hold that the jury may consider package inserts and parallel PDR references, when they are supported by expert testimony, to determine the appropriate standard of care in a medical malpractice case.

This holding is consistent with our opinion in *Sanzari v. Rosenfeld, supra,* 34 *N.J.* at 139, 167 *A.2d* 625, which sustained the introduction of a manufacturer's brochure to prove that the defendant physician knew of the contents of the insert. When reaching that result, we stated "it is unnecessary for us to determine whether a manufacturer's brochure, alone or in conjunction with other evidence, is admissible as proof of the standard of care in the administration of a drug." *Ibid.*

Traditionally, courts measure a doctor's duty in a medical malpractice action by an objective standard of care. With rare exception, expert testimony is needed to establish the standard of care. *See Rosenberg ex rel. Rosenberg v. Cahill,* 99 *N.J.* 318, 325, 492 *A.2d* 371 (1985) ("[I]n the ordinary medical malpractice case, 'the standard of practice to which [the defendant-practitioner] failed to adhere must be established by expert testimony....' ") (citation omitted); *Schueler v. Strelinger,* 43 *N.J.* 330, 345, 204 *A.2d* 577 (1964) (holding that with rare exceptions, evidence of

deviation from accepted medical standards must be provided by expert testimony).

Expert testimony is necessary to establish the standard of care in a medical malpractice action for several reasons. "Ordinarily a jury of laymen cannot be allowed to speculate as to whether the procedure followed by a treating physician conformed to the required professional standards." *Schueler, supra,* 43 *N.J.* at 345, 204 *A.*2d 577. *See also Walck v. Johns–Manville Products Corp.,* 56 *N.J.* 533, 562, 267 *A.*2d 508 (1970) ("Ordinarily, a court cannot be permitted to speculate as to whether the diagnosis and procedure followed by a treating physician conformed to the required professional standards."). In most cases, without expert testimony, it would expect too much of jurors to ask them to set the standard by which to measure a medical doctor's conduct. As we have explained, jurors generally lack the " 'requisite knowledge, technical training, and background to be able to determine the applicable standard without the assistance of an expert.' " *Rosenberg, supra,* 99 *N.J.* at 325, 492 *A.*2d 371 (quoting *Sanzari, supra,* 34 *N.J.* at 134–35, 167 *A.*2d 625).

■ The first issue on this appeal is whether the PDR may be introduced in evidence to prove the standard of care applicable to a doctor's prescription of medicine. When supported by expert testimony, PDR entries and package inserts may provide useful information of the standard of care. Physicians frequently rely on the PDR when making decisions concerning the administration and dosage of drugs. James R. Bird, *Package Inserts for Prescription Drugs as Evidence in Malpractice Suits,* 44 *U. Chi. L.Rev.* 398, 416 (1977) (citing Survey of Drug Information Needs and Problems Associated with Communications Directed to Practicing Physicians (May 6, 1974), reprinted in *Examination of the Pharmaceutical Industry, 1973–74, Hearings before the Subcomm. on Health of the Senate Comm. on Labor and Public Welfare,* 93rd Cong., 1st & 2nd Sess. (1973–74)). Often, the drug manufacturer, which has developed and tested the drug, may be in

a better position than the physician to determine the appropriate usage and dosage of drugs.

Nevertheless, drug manufacturers do not design package inserts and PDR entries to establish a standard of medical care. *Ramon, supra,* 770 *P.*2d at 135; *Salgo v. Leland Stanford Jr. Univ. Bd. of Trustees,* 154 *Cal.App.*2d 560, 317 *P.*2d 170, 180 (1957). Manufacturers write drug package inserts and PDR warnings for many reasons including compliance with FDA requirements, advertisement, the provision of useful information to physicians, and an attempt to limit the manufacturer's liability. *Thompson v. Carter,* 518 *So.*2d 609, 612 (Miss.1987); *Ramon, supra,* 770 *P.*2d at 136. After a drug has been on the market for a sufficient period of time, moreover, physicians may rely more on their own experience and the professional publications of others than on a drug manufacturer's advertisements, inserts, or PDR entries. *Salgo, supra,* 317 *P.*2d at 180.

Those considerations highlight the reasons expert testimony must accompany the introduction of PDR warnings to establish the applicable standard of care in prescribing a drug. Additionally, expert testimony often is needed to explain the information contained in package inserts or the PDR. Drug manufacturers write explanations and warnings for doctors, not the general public. Comprehension of the terms and their significance may depend on medical expertise. *Craft v. Peebles,* 78 *Hawai'i* 287, 893 *P.*2d 138, 151 n. 17 (1995).

■ Accordingly, we hold that package inserts and PDR references alone do not establish the standard of care. It follows that a physician's failure to adhere to PDR warnings does not by itself constitute negligence. Reliance on the PDR alone to establish negligence would both obviate expert testimony on an issue where it is needed and could mislead the jury about the appropriate standard of care.

■ Similarly, a party may not generally introduce a treatise into evidence as a substitute for expert testimony. *Adamski v.*

*Moss,* 271 *N.J.Super.* 513, 519–22, 638 *A.*2d 1360 (App.Div.1994); Biunno, *Current New Jersey Rules of Evidence,* Comment on *N.J.R.E.* 803(c)(18). As we recently stated when considering the admissibility of learned treatises under *N.J.R.E.* 803(c)(18), a learned treatise's use as "'substantive evidence is limited to situations in which an expert is on the stand and available to explain and assist in the application of the treatise if desired.'" *Jacober v. St. Peter's Medical Ctr.,* 128 *N.J.* 475, 491, 608 *A.*2d 304 (1992) (citing *Fed.R.Evid.* 803(18) advisory committee's note).

Allowing the admission of PDR warnings without accompanying expert testimony could transform drug manufacturers into judges of acceptable medical care. The effect would be to force doctors to follow the PDR's recommendations or run the risk of liability for malpractice. Michael J. Farell, *Medication Malpractice: Claims, Culprits and Defenses,* 16 *Am. J. Trial Advoc.* 65, 80 (1992).

Whether to prescribe a drug and, if so, what drug to prescribe are issues that demand careful consideration. The decision to prescribe a particular drug ultimately is a matter of judgment for the physician. In addition to considering the individual patient, the physician may consider all available information concerning a drug. The information may include the manufacturer's inserts and PDR warnings, as well as medical journals, advice from colleagues, and the physician's own experience.

To confine the treatment choices to those expressly permitted in the PDR would be too restrictive. *Ramon, supra,* 770 *P.*2d at 133. Such an approach also would be inconsistent with the FDA's position that physicians are not bound by PDR recommendations. *Ibid.* Indeed, the forward to the 1997 PDR advises the following:

> The FDA has always recognized that the [Food, Drug, and Cosmetics] Act does not, however, limit the manner in which a physician may use an approved drug. Once a product has been approved for marketing, a physician may choose to prescribe it for uses or in treatment regimens or patient populations that are not included in approved labeling. The FDA also observes that accepted medical practice often included drug use that is not reflected in approved drug labeling.
>
> [*Physician's Desk Reference,* Forward (51st ed.1997).]

In sum, we hold that the trial court did not commit reversible error in refusing to read to the jury the two warnings in the PDR. We further hold that the trial court did not err in refusing to instruct the jury that if Dr. Dugenio knew of the PDR warnings and nonetheless violated them, his conduct was evidence of negligence. Although admissible along with expert testimony on the issue of the standard of care, the PDR's recommendations are not conclusive evidence of the standard of care or accepted practice in using the drug. Thus, the PDR entries do not, as a matter of law, establish the standard of care or negligence.

### III.

■ Morlino next contends that the trial court erred by delivering a charge virtually identical to Model Jury Charge 5.36(A)— Civil, Medical Malpractice, Duty and Negligence as it existed at the time of trial. Over Morlino's objection, the trial court delivered the following charge:

In examining the conduct of a defendant physician to determine whether there is a deviation from an accepted standard of care, that is, whether the doctor was negligent, you should understand that the practice of medicine is not an exact science; therefore, the law recognizes that the practice of medicine according to accepted medical standards will not prevent a poor or unanticipated result.

If a physician has applied the required knowledge, skill and care in the diagnosis and treatment of a patient, he or she is not negligent merely because there was a bad result.

Likewise, where, according to accepted medical standards or practice, the manner in which the diagnosis or treatment is conducted is a matter subject to the judgment of the physician, the physician must be allowed to exercise his judgment. *The physician cannot be held liable if, in the exercise of his judgment, he nevertheless made a mistake.* Where judgment must be exercised, the law does not require the doctor to have infallible judgment. Thus, a physician cannot be found negligent so long as he or she employs such judgment as is allowed by the accepted medical practice.

If, in the exercise of his judgment, a doctor selects one or two or more courses of action, each of which in the circumstances has substantial support as proper practice by the medical profession, the doctor cannot be found negligent if the chosen path produces a poor result.

On the other hand, a doctor who departs from the standard medical practice where no judgment is permitted, he cannot be excused, and nor can he excuse himself from the consequences by saying that it was an exercise of his judgment. Or, to

state it in a different way, if the exercise of a doctor's judgment causes him to do that which the standard medical practice forbids, the doctor would be negligent.

Similarly, a doctor whose judgment causes him or her to omit doing something which is required by the standard medical practice, he is also negligent.

[ (emphasis added).]

After the Appellate Division rendered its opinion in the present case, the Supreme Court Committee on Model Jury Charges, Civil, revised Model Charge 5.36A. The part of the charge applicable to a physician's exercise of judgment, however, remains substantially unchanged. Consequently, our analysis of the subject charge applies also to the revised Model Charge.

The Model Charge follows from our statement in *Schueler v. Strelinger, supra,* 43 *N.J.* 330, 204 *A.*2d 577:

So, if the doctor brought the requisite degree of care and skill to his patient, he is not liable simply because of failure to cure for bad results that may follow. Nor in such case is he liable for an honest mistake in diagnosis or in a judgment as to the course of treatment taken. A physician must be allowed a wide range in the reasonable exercise of judgment. He is not guilty of malpractice so long as he employs such judgment, and that a judgment does not represent a departure from the requirements of accepted medical practice, or does not result in failure to do something accepted medical practice obligates him to do, or in the doing of something he should not do measured by the standard above stated.

[*Id.* at 344–45, 204 *A.*2d 577.]

At issue in this case is the role of judgment in medical practice. Physicians and surgeons frequently grapple with uncertainty when diagnosing and treating patients. Each patient presents a unique set of facts and a range of possible responses. Symptoms often point in different directions or in no distinct direction.

Having made a diagnosis, the doctor must decide whether and how to treat the patient. Doctors must select treatment options from an evolving body of scientific and medical information. Medicine remains an inexact science. *Crego v. Carp,* 295 *N.J.Super.* 565, 574, 685 *A.*2d 950 (1996), *certif. denied,* 149 *N.J.* 34, 692 *A.*2d 48 (1997). The choice may not be clear and alternatives may abound, but choose the doctor must. In selecting among alternative treatments, however, the doctor must exercise his or her judgment and select from alternatives that are objec-

tively reasonable. The selection of an alternative that is objectively unreasonable would violate the doctor's duty of care to the patient.

■ In making diagnoses and selecting among treatment options, doctors must rely on their training and experience, as well as such considerations as the patient's age, gender, and physical or mental condition. When evaluating those variables, physicians should not act mechanically, but with due regard for the individual needs of each patient. *Newmark v. Gimbel's Inc.*, 54 *N.J.* 585, 596–97, 258 *A.*2d 697 (1969). Not recognizing the role of judgment in making a diagnosis or in deciding on a course of treatment would be to deny an essential element in the practice of medicine. Accordingly, Model Charge 5.36(A) rightly recognizes that a physician may exercise judgment when choosing among acceptable treatment alternatives.

■ Doctors may exercise reasonable care and still produce a bad result. "A doctor is not an insurer of his patient's recovery. He is not a guarantor." *Clark, supra,* 72 *N.J.Super.* at 495, 179 *A.*2d 38. The practice of medicine according to accepted medical standards will sometimes lead to a poor or unanticipated result. Whether the doctor has committed an act of malpractice depends not on the outcome, but on whether the doctor adhered to the applicable standard of care.

By comparison, whether a trial lawyer has committed an act of legal malpractice depends not on the outcome of the proceeding, but on whether the lawyer adhered to the appropriate standard of care in representing the client. Thus, the exercise of judgment is critical to both the legal profession and the medical profession. Neither the trial lawyer nor the doctor insures a good result. Both, however, must act consistently with the relevant standard of care.

Plaintiff and *amicus curiae,* American Trial Lawyers' Association (ATLA), invite us to delete entirely from the Model Charge the phrase "exercise of judgment." Similarly, the Appellate Divi-

sion states that a growing number of courts from other jurisdictions have rejected "exercise of judgment" instructions because they "confuse jurors into focusing on the health care provider's subjective intentions and judgments rather than the real issue of whether the health care provider's conduct conformed to an objective standard of care." 296 *N.J.Super.* at 128, 686 *A.2d* 356 (quoting *Parodi v. Washoe Medical Ctr., Inc.,* 111 *Nev.* 365, 892 *P.2d* 588, 590 (1995)).

Our reading of the cases both in this state and elsewhere leads us to a different conclusion. Courts in other jurisdictions have rejected charges not because they recognize that physicians and surgeons exercise judgment, but because the charges contained language such as "good faith judgment," "bona fide judgment," "honest mistake," "honest error in judgment," and "bona fide error in judgment." *See Jefferson Clinic, P.C. v. Roberson,* 626 *So.2d* 1243, 1247 (Ala.1993) (rejecting reverse "honest error in judgment" charge, which instructed jury that it was no defense if acts or omissions of defendant physician or employees and agents of defendant clinic were made in good faith or through error in judgment, because "injection of subjective standard rather than objective standard into the jury's deliberative process clearly causes confusion"); *Shumaker v. Johnson,* 571 *So.2d* 991, 994 (Ala.1990) (holding that "honest error in judgment" and "good-faith error jury charge should not be given in medical malpractice cases because of its potential for confusing the jury"); *Logan v. Greenwich Hosp. Ass'n,* 191 *Conn.* 282, 465 *A.2d* 294, 303 (1983) (finding error in charge containing term "bona fide error in judgment" because term "seems only to confuse a jury by implying that only an error in judgment made with bad faith can be actionable"); *Krattenstein v. Thomas,* 7 *Conn.App.* 604, 509 *A.2d* 1077, 1079 (finding error in charge containing term "bona fide error in judgment," but holding that charge as whole did not mislead or confuse jury given repetition of applicable standard of care and lack of allegation that defendant acted in bad faith), *certif. denied,* 201 *Conn.* 807, 515 *A.2d* 378 (1986); *Veliz v. American Hosp., Inc.,* 414 *So.2d* 226, 227–28 (Fla.Dist.Ct.) (reject-

ing "honest error in judgment" charge because "jury could have found the defendant [hospital] not liable because it believed the nurse on duty made an honest mistake of judgment while at the same time it could also have believed her conduct constituted a clear departure from the standard of care"), *review denied,* 424 *So.*2d 760 (Fla.1982); *Day v. Morrison,* 657 *So.*2d 808, 815 (Miss. 1995) (rejecting use of "mere error of judgment," "good faith error in judgment," or "honest error in judgment" instructions "because of their potential for confusing the jury"); *Parodi, supra,* 892 *P.*2d at 591 (rejecting "error in judgment," "honest" or "best judgment" language because they "may confuse jurors into focusing on the health care provider's subjective intentions and judgments rather than on the real issue of whether the health care provider's conduct conformed to an objective standard of care"); *Wall v. Stout,* 310 *N.C.* 184, 311 *S.E.*2d 571, 577 (1984) (holding inappropriate "honest error" language because it could easily be interpreted by jury to mean that physician could not be liable for negligence unless he was somehow dishonest); *Kurzner v. Sanders,* 89 *Ohio App.*3d 674, 627 *N.E.*2d 564, 567 (1993), *reh. denied,* 68 *Ohio St.*3d 1448, 626 *N.E.*2d 689 (1994) (finding prejudicial error in charge containing term "honest error or mistake in judgment" because "it changed the standard of care from an objective one to a subjective one"); *DiFranco v. Klein,* 657 *A.*2d 145, 148 (R.I.1995) (holding that phrases such as "good faith," "good faith judgment," "honest mistake," and "honest error of judgment" in jury charge tend to create confusion among jurors by erroneously implying that only dishonest or bad-faith deviation from applicable standard of care constitutes "actionable negligence"); *Shamburger v. Behrens,* 380 *N.W.*2d 659, 663 (S.D.1986) (rejecting use of phrase "good faith error in judgment" in charging jury because it "unduly confuses the issues in a negligence action"); *Rooney v. Medical Ctr. Hosp. of Vermont, Inc.,* 162 *Vt.* 513, 649 *A.*2d 756, 760–61 (1994) (rejecting use of: (1) "best judgment" language because instruction "would improperly permit a jury to conclude that a physician who lacked the requisite skill or knowledge is not liable as long as she used her best judgment

and reasonable care in the exercise of whatever skill or knowledge she did possess, however limited;" and (2) "mere error in judgment" language because it is "ambiguous and subjective"); *Teh Len Chu v. Fairfax Emergency Medical Assocs., Ltd.*, 223 Va. 383, 290 *S.E.*2d 820, 822 (1982) (stating that terms such as "honest mistake" and "bona fide error in judgment" have no place in jury instructions because they "defy rational definition" and "tend to muddle the jury's understanding of the plaintiff's burden in a malpractice action").

Only one case cited by the Appellate Division, *Yeager v. Riverside Methodist Hosp.*, 24 *Ohio App.*3d 54, 493 *N.E.*2d 559, 561 (1985), criticized the use of the word "judgment" alone in a jury charge. In that case, the court first noted that the defendant doctor's conduct should be measured by an objective standard of care. *Id.* 493 N.E.2d at 561. The court then criticized part of the charge stating that the jury should consider a physician's "judgment" in determining whether he was medically negligent as suggesting a subjective standard of care. *Id.* at 562. Nevertheless, the court found the "judgment" instruction to be harmless error because the charge as a whole recognized that the defendant's conduct was to be measured by an objective standard of care. *Ibid.*

We disagree that a charge that recognizes the doctor's exercise of judgment necessarily will mislead jurors to focus on a physician's subjective intentions, rather than on the conformance of the physician's conduct to an objective standard of care. Indeed, a charge that does not recognize the critical role of judgment would be deficient.

By comparison, terms such as "good faith," "honest," and "bona fide," could lead the jury to believe that, to find the defendant negligent, the plaintiff must prove bad faith, dishonesty, or fraud. Motivation, however, plays no part in determining negligence with regard to an objective standard of care. The physician's exercise of judgment is to be evaluated not on the

basis of the physician's good faith or honesty, but solely on whether it falls below an objective standard of care.

Model Jury Charge 5.36(A) does not contain the language that the out-of-state cases found offensive, and, as a whole, correctly describes the relationship between judgment and the standard of care. The charge does not suggest that a physician is immune from liability as long as he or she does his or her best. Indeed, two other parts of the Appellate Division recently have concluded that the Model Charge when read in its entirety does not have the capacity to confuse jurors. *Crego, supra,* 295 *N.J.Super.* at 574, 685 *A.*2d 950; *Hofstrom v. Share,* 295 *N.J.Super.* 186, 195, 684 *A.*2d 981 (App.Div.1996), *certif. denied,* 148 *N.J.* 462, 690 *A.*2d 610 (1997). *See also Pepe v. Jayne,* 761 *F.Supp.* 338 (D.N.J.) (holding that New Jersey Model Charge containing sentence "physician cannot be held liable if in the exercise of judgement he has, nevertheless, made a mistake," was not confusing or likely to mislead jury when read in context), *aff'd sub nom Pepe v. Shore Memorial Hosp.,* 947 *F.*2d 936 (3rd Cir.1991).

■ One sentence in the Model Charge is problematic. The sentence reads, "The physician cannot be held liable if, in the exercise of his judgment, he nevertheless made a mistake." *See Riggins v. Mauriello,* 603 *A.*2d 827, 831 · (Del.1992) (rejecting charge stating that "a physician cannot be held liable for a mere error of judgment in deciding what to do or what not to do for the patient provided he has done what he thinks best in the exercise of reasonable care" because "a jury could too readily conclude, incorrectly, that a physician is not liable for malpractice even if he or she is negligent in administering the treatment selected"); *Rogers v. Meridian Park Hosp.,* 307 *Or.* 612, 772 *P.*2d 929, 933 (1989) (holding that "error in judgment" instruction "obscures the fact that, to avoid liability, the defendant must exercise the degree of care, skill, and diligence required by law," and "suggest[s] that substandard conduct is permissible if it is garbed as an 'exercise of judgment' ").

The purpose of the sentence is to advise the jury that, as between two or more courses of action, each of which accords with accepted medical practice, a doctor will not be found negligent if the course of action he or she chooses turns out to be unsuccessful. Taken out of context, the sentence could be understood to mean that a doctor who deviates from the relevant standard of care is not liable if the mistake was the result of the exercise of medical judgment. The danger is that the sentence could be construed to mean that an honest, but mistaken, exercise of judgment insulates the physician from liability for a mistake that violates a relevant standard of care. A mistake, however, connotes an instance in which the physician violates such a standard of care. Consequently, a physician who fails to abide by an objective standard of care is subject to liability even if the failure results from the exercise of judgment.

As the Appellate Division recognized, however, the balance of the subject charge refers to the pertinent medical standard of care by which to measure the physician's judgment. 296 *N.J.Super.* at 127, 686 *A.2d* 356. The charge as a whole thus clarifies that a deviation from the standard of care is negligence:

[A] doctor who departs from standard medical practice where no judgment is permitted cannot excuse himself from the consequences by saying that it was an exercise of his judgment. Or, to state it in a different way, if the exercise of a doctor's judgment causes him to do that which standard medical practice forbids, the doctor would be negligent. Similarly, a doctor whose judgment causes him to omit doing something which is required by standard medical practice is also negligent.

Accordingly, we hold that Model Jury Charge 5.36(A), when read in its entirety, does not have the capacity to mislead the jury.

■ Another criticism of the Model Charge is the repetitive use of the term "exercise of judgment." *Id.* at 127–28, 686 *A.2d* 356. In fact, the charge mentions "exercise of judgment" eleven times. Similarly, the charges on attorney and architect malpractice also mention "judgment" approximately the same number of times. N.J. Model Jury Charge—Civil, Attorney Malpractice § 5.37(A) (mentioning "judgment" ten times in attorney malpractice charge); N.J. Model Jury Charge—Civil, Architect Malprac-

tice § 5.38(A) (mentioning "judgment" in architect malpractice charge thirteen times). The number eleven is not a talisman. The word "judgment," moreover, can be used to inculpate as well as exculpate a physician. For example, in the charge on medical malpractice the word appears four times to indicate situations in which the exercise of judgment does not excuse a physician. Thus, the mere repetition of the word "judgment" need not necessarily mislead a jury to exculpate a culpable doctor.

Like other forms of expression, a model charge may benefit from review. See generally Dorothy E. Bolinsky, *New Jersey's Medical Malpractice Model Jury Instruction: @#! %¶, Comprehensible to the Jury?*, 28 *Rutgers L.J.* 261 (1996) (recommending revision of Model Jury Charge 5.36(A)). Accordingly, we remand consideration of Model Jury Charge 5.36(a) to the Supreme Court Committee on Model Jury Charges, Civil. In reviewing the charge, the Committee should determine whether fewer than eleven references to judgment adequately will communicate to the jury that medicine is not an exact science and that physicians and surgeons must exercise judgment. Because of its potential to confuse the jury, the revised charge should eliminate the sentence suggesting that a doctor is not liable for a mistake that results from the exercise of judgment. Finally, the Committee should try to make the entire charge shorter and clearer.

Our conclusion that the trial court did not commit reversible error in denying admission into evidence of the PDR entry or in charging the jury leads us to reject Morlino's contention that she is entitled to a new trial because of cumulative error.

The judgment of the Appellate Division is affirmed as modified.

*For modification and affirmance*—Chief Justice PORITZ and Justices HANDLER, POLLOCK, O'HERN, GARIBALDI, STEIN and COLEMAN—7.

*Opposed*—None.