788 A.2d 861 (2002)
347 N.J. Super. 1
Ronald J. BRAMBLEY, Plaintiff-Appellant,
v.
Lynn B. McGRATH, M.D., Defendant-Respondent, and
Panambur Manohar Kini, M.D., Theodore John Southgate, M.D., John C. Incarvito, M.D., f/n/u Erfe, M.D., Joseph Costic, M.D., Stephanie Flicker, M.D., Rido Cha, M.D., Sing San Yang, M.D., Roberto Carvajal, M.D., f/n/u Royalty, M.D., Deborah Heart & Lung Center, and St. Jude Medical, Inc., Defendants.
Superior Court of New Jersey, Appellate Division.
Submitted October 30, 2001.
Decided January 22, 2002.
*862 Beasley Casey & Erbstein, Mount Laurel, attorneys for appellant (Michael A. Smerconish, of counsel; James J. McHugh, on the brief).
Parker, McCay & Criscuolo, attorneys for respondent (Thomas M. Barron, Moorestown, on the brief).
Before Judges PRESSLER, WEFING and LESEMANN.
The opinion of the court was delivered by LESEMANN, J.A.D.
In this medical malpractice case, the jury found no cause of action against the cardiothoracic surgeon who implanted an artificial mitral valve in plaintiff's heart. Plaintiff claims he was prejudiced by the trial court's refusal to let his expert witness refer to a pamphlet provided by the manufacturer of the valve, outlining the proper method for its installation. That ruling, plaintiff argues, which followed questioning by defense counsel designed to indicate that there was no professional literature which supported the expert's position, left the jury with the impression that plaintiff's expert was a "lone wolf" with respect to his position and that there was no professional support for his thesis. Plaintiff contends his expert should have been permitted to refer to the pamphlet *863 under the Learned Treatise provision of the Rules of Evidence, N.J.R.E. 803(c)(18), particularly after defendant had raised the issue. We agree, and accordingly we reverse and remand the matter for a new trial.
In October 1991, plaintiff underwent surgery for implantation of a prosthetic mitral valve, which regulates the flow of blood in the heart between the left atrium and the left ventricle. The surgery was performed by defendant, Dr. Lynn McGrath, and the replacement valve was manufactured by St. Jude Medical, Inc.
During the years following the surgery, plaintiff continued to have cardiac problems related to the mitral valve. In August 1996, he underwent corrective surgery and in January 1999, he had still more surgery. According to plaintiff, he nevertheless remains disabled. His contention is that all the problems following the initial surgery stemmed from defendant's faulty surgical technique, which improperly anchored the valve into his heart.
Plaintiff's expert trial witness was Dr. James Finnegan. He testified that proper implantation technique is to sew the replacement mitral valve to the annulus, a fibrous portion of the heart which lies at the base of the mitral valve and is the seating mechanism which holds the valve in place. Defendant, however, did not attach the mitral valve to the annulus, but rather stitched it to adjoining parts of the heart known as leaflets. According to Dr. Finnegan, the annulus "is a little thicker, a little fibrous," whereas the leaflets
are quite thin and very floppy and pliable, if you will, normally. They're meant to do almost like sort of a parachute effect, so they have to be soft and moveable, okay? The annulus is part of what anatomists would call the fibrous skeleton of the heart. In other words, it's the base anchor tissue inbuilt inside the heart to hold everything in place. So, the annulus generally has some firmness and structure to it, whereas the leaflets tend to be soft and mobile.
As Dr. Finnegan described attaching the mitral valve to the annulus, the stitches are "put in place all around that ring, all around that annulus," and when the surgeon is finished, "you now have this valve sitting, sewn snugly into that annulus."
Dr. Finnegan was next asked if there were "circumstances where sewing the valve not to the annulus but solely to the leaflets is appropriate." He responded that such a procedure would be appropriate in only "very rare circumstances" where the annulus was "filled with calcium." In plaintiff's case, however, that did not exist and thus there was no reason not to attach the valve to the annulus.
After that testimony, Dr. Finnegan was asked whether he had an opinion "within a reasonable degree of medical certainty, as to what the standard of care required with regard to implantation of mitral heart valve in October 1991"? He answered that he did have such an opinion, and when he was then asked what that opinion was, he began to respond by saying, "I think, if youmy opinion is that the valve should be sewed to the annulus. And, the reason I say that is, if you look at any textbook."
At that point, defense counsel objected. He said that during pre-trial depositions Dr. Finnegan had been asked whether his opinion depended on any particular textbook or treatise in the field. His response had been equivocal, and he had said, "I certainly could do that if asked," but he continued by saying that his conclusion was "general knowledge" in the field. When he had then been asked essentially the same question a second time, he had *864 responded that, "I don't recall ... that I have specifically referred to specific literature in my report."
In view of that pre-trial testimony, defense counsel's objection at trial when Dr. Finnegan began to say, "If you look at any textbook ...," was understandable. He argued that Dr. Finnegan should not be permitted to volunteer the name of a textbook or treatise that supported his opinion, when during deposition he had not provided the title of any such work. After some colloquy between court and counsel, the court sustained the objection.
Had the matter ended there, plaintiff would have had no basis to complain. However, the matter did not end there. Instead, defense counsel set out to demonstrate that Dr. Finnegan's opinion was not supported by any authority except his own subjective notion of the best way to proceed. He asked the witness about standards that may have been promulgated by two thoracic surgical societies. Dr. Finnegan responded that those standards supported his position, but he acknowledged that he did not have copies of the standards with him. Defense counsel then asked the following:
There is no place, is there, Doctor, that Dr. McGrath (the defendant) can go or the jury can go and say, ah-ha, here's the American College of Cardio Thoracic Surgeons and here's the standard they put forth, and you've got to sew to the annulus? There is no place that that exists; isn't that true?
To that, Dr. Finnegan replied, "Oh, yes, it does. And I have a document which I provided." Dr. Finnegan then said he was referring to the Technical Guide for Prosthetic Mitral Heart Valves published by St. Jude's, the manufacturer of the device used by the defendant, which specified that the valve should be sewn to the annulus rather than the leaflets. Defense counsel objected to any reference to the St. Jude's publication. When the court indicated an inclination to sustain the objection, plaintiff's counsel argued that the question from his adversary had suggested there were no published standards respecting installation of the mitral valve. He then said this:
The implication has been made now that he's [Dr. Finnegan's] a lone wolf out there, that there's nowhere that one can go and see in print what he is advocating. And the facts are that St. Jude's themselves offers a guide that physicians and the (inaudible) itself says, you can suture to the annulus. There's actually a section of the guide that shows the suturing placement of the mitral valve in the annulus. So in response to Mr. Veenstra's [defense counsel's] questions about where is his opinion backed up with literature, this is the answer.
Plaintiff's counsel then noted that he had provided the St. Jude's Guide to his adversary some time ago. He continued:
It's probably the most relevant information this jury could receive. And, given that he's [defense counsel's] opened up the door to the whole subject of "what does the literature say," I think this jury would be prejudiced if they didn't know that St. Jude's themselves have published a guide for how you do the surgery.
The court, however, did not accept the argument. It responded:
I disagree. Counsel [that is, defense counsel] did not open the door to what literature is out there or what literature exists. The only piece of literature that was referenced on direct examination the only documentation put forth was the American College of Cardio Thoracic Surgeons. He has a right to ask whether he has that report but.... *865 And, the court continued, "The only thing he's [defense counsel's] asked about is the American College of Cardio Thoracic Surgeons, which he mentioned on his direct."
The argument continued in that vein, with no change in the court's ruling. Plaintiff's counsel pointed out that the St. Jude's document had been available to defense counsel just as it had been available to plaintiff's counsel. He added that the document "speaks directly to the issue before this jury of the standard of care. I am holding in my hands a guide put out by the manufacturer of the device on which the manufacturer says, this is how you go about anchoring it, namely to the annulus." Defense counsel responded that he was "very careful with saying that American Society of Cardio Thoracic Surgeons" in his question, and he insisted that plaintiff's answer be limited to printed material from that source and no other. Plaintiff's counsel responded that, in that event, and to avoid the distorted picture he had referred to earlierhe wanted to have Dr. Finnegan discuss the St. Jude's instruction manual on re-direct examination. The court rejected that request, and Dr. Finnegan's cross-examination ended with the following question and answer:
The question was, do you have any standards from your American College of Cardio Thoracic Surgeons which would suggest to the jury that the basis of your opinion is based on that, that says you have to sew it to the annulus and not to the leaflet? Do you have it with you?
A. I do not.
The prior rulings, of course, precluded Dr. Finnegan from supplementing that answer to provide a more realistic picture, by referring to the St. Jude's brochure.
We agree with plaintiff that the court's ruling may well have left the jury with the incorrect impression that there were no objective standards pertaining to installation of a prosthetic mitral valve, and that Dr. Finnegan's opinion rested on nothing but his own subjective impression. While defense counsel, for obvious tactical reasons, phrased his question very narrowly and specificallylimiting it to the thoracic societies and excluding the manufacturer of the valvethere was no reason why Dr. Finnegan should not have been able to expand his answer, at least on re-direct examination, to provide a more accurate, fully rounded picture, than was presented by the limited question and limited answer pertaining to the thoracic societies. The court provided no such reason, nor do we see any reasonable basis for the ruling.
N.J.R.E. 803(c)(18) deals with the admissibility of statements contained in "Learned Treatises." While the rule is captioned, "Learned Treatises," it actually covers publications beyond what one might normally think of as a "treatise." It refers to "statements contained in published treatises, periodicals or pamphlets on a subject of ... medicine ... established as a reliable authority by testimony or by judicial notice." Certainly the pamphlet here, composed and provided by the manufacturer of St. Jude's prosthetic mitral valve, instructing as to the means of installation and the anchoring of that valve, falls squarely within the rule provision. Its status as a "reliable authority" seems so self-evident as to be properly the subject of judicial notice, or, alternatively, there is no doubt that Dr. Finnegan would have testified to that effect. See Morlino v. Med. Ctr. of Ocean Cty., 152 N.J. 563, 578-82, 706 A.2d 721 (1998), holding that package inserts provided by pharmaceutical manufacturers and references in the Physician's Desk Reference were admissible in medical malpractice cases, in conjunction with expert testimony explaining the significance *866 of the material.[1]
Defendant's argument against use of the St. Jude's manual rests on three claims, none of which we find persuasive. First, defendant notes that during his pre-trial deposition, Dr. Finnegan did not say he had "relied on" the St. Jude's material in reaching his expert opinion. That is true. However, it is also true that Dr. Finnegan indicated there were written standards which supported his position, and he offered to provide them if requested. And again, we note the limited proposed use of the printed material at trial. Neither plaintiff's counsel nor Dr. Finnegan referred to the printed material during Dr. Finnegan's direct testimony. Neither claimed that the doctor relied on that material in formulating his opinion. Rather, the subject arose, and reference to the material became critical, only after defense counsel had argued that there were no such standards which provided any support for Dr. Finnegan's opinion.
Second, defendant argues that the court properly barred plaintiff's attempt to discuss the St. Jude's material on re-direct examination because it had not been mentioned on direct examination. That argument, however, is circular: it ignores the fact that a basic purpose of re-direct examination is to respond to new material elicited during cross-examination of a witness. See State v. Marshall, 148 N.J. 89, 168-69, 690 A.2d 1 (1997). That is precisely what plaintiff was attempting to do here and, even assuming the propriety of precluding Dr. Finnegan from mentioning the St. Jude's material during his cross-examination, we can see no conceivable reason why he should not have been permitted to do so on re-direct examination in order to correct an otherwise inaccurate impression which may have been given to the jury.
Defendant's third argument against use of the St. Jude's printed material cites the language of N.J.R.E. 803(c)(18), which refers to using such material "[t]o the extent called to the attention of an expert witness upon cross-examination or relied upon by the expert in direct examination." Defendant argues that neither basis for admission existed here: that the material was not "called to the attention of [Dr. Finnegan] upon cross-examination"; nor was it "relied upon by [him] in direct examination." We are satisfied, however, that a realistic and common sense reading of the rule does not require the artificially narrow construction which defendant would give to it.
We have already noted that, notwithstanding defense counsel's carefully chosen language during cross-examination, the intent and effect of that language was to bring "to the attention of [the] expert witness" the subject of printed material, and convey the impression that there was no such material that supported Dr. Finnegan's position. Unfortunately, when the court insisted that Dr. Finnegan answer defense counsel's question in the same restrictive language that counsel used in framing the question, the effect was to create a seemingly accurate answer, which in fact provided a very inaccurate picture. For the reasons already discussed, a fair, realistic and truly accurate response to the question would have permitted Dr. Finnegan to include in his answer a reference to the St. Jude's pamphlet.
Finally, we note defendant's claim that the St. Jude's material was submitted to him too late to comply with discovery obligations, *867 and therefore it should not have been admitted at trial. That argument, however, has no merit.
As far back as November 1997 over two years before trialplaintiff had provided defense counsel with the twenty-three page booklet entitled, "Physician's Manual, St. Jude Medical Mechanical Heart Valve," which contained the material described above relating to St. Jude's "mechanical heart valve [which] is intended for use as a replacement valve in patients with a diseased, damaged or malfunctioning aortic or mitral heart valve." However, as the trial date approached, plaintiff's counsel realized that the manual he had provided bore a 1995 copyright date, which post-dated the 1991 surgery. He then set out to locate the counterpart of the 1995 brochure which had been in effect at the time of the 1991 surgery. As a result, he located and transmitted to his adversary the earlier version of that manuala forty-three page manual entitled, "Physician's Manual, St. Jude Medical Mechanical Heart Valve," as well as additional related material. That material bore a 1988 copyright date and was in effect at the time of plaintiff's surgery in 1991. It was delivered approximately two weeks before trial. In substance, it was virtually indistinguishable from the 1995 version which had been provided to defense counsel two years earlier. Thus, the alleged late delivery was more apparent than real. It was non-prejudicial and there is no suggestion or argument that the updating of the material caused any prejudice of any kind to defendant.
For all these reasons, we are satisfied that substantial justice required that plaintiff be permitted to present testimony concerning the St. Jude's written material, to offset and avoid what would otherwise be an inaccurate and prejudicial misapprehension with which the jury might be left: that there was no respectable published material, from an objective, impartial source, which supported Dr. Finnegan's opinion. The exclusion of that material rested on what we conceive to be an unrealistically narrow reading of N.J.R.E. 803(c)(18), and also an unrealistically narrow interpretation of the critical question which defense counsel put to Dr. Finnegan as part of his suggestion that there was "no place that ... [the defendant doctor] or the jury can go" to find the standard to which Dr. Finnegan referred. In fact, there was such a place and there was such material, and it should have been presented to the jury. Its exclusion affected a critical part of this case, and there is no basis on which we could conclude that the error was harmless.
Accordingly we reverse and remand for a new trial.
NOTES
[1] N.J.R.E. 803(c)(18) provides that printed statements meeting the criteria of the rule are not to be "received as exhibits" but may be "read into evidence." Here, that would certainly have satisfied plaintiff's purpose, of rebutting defendant's claim that there were no written professional standards concerning implantation of the artificial mitral valve.