220 N.J. Super. 317 (1987)
531 A.2d 1373
MARCELINO GRACIA AND CARMEN GRACIA, PLAINTIFFS,
v.
FREDERICK MEISELMAN, D.D.S., DEFENDANT.
Superior Court of New Jersey, Law Division Union County.
Decided May 29, 1987.
*318 George Duggan for plaintiffs (Jacobson, Lerner & Silverman, attorneys).
Stephen H. Schechner for defendant.
SACHAR, J.S.C.
Plaintiff offered his hospital bill in evidence and the court reserved decision. Despite the increase in malpractice filings in *319 general and the common practice of adding a second count alleging lack of informed consent as an alternate cause of action, there is a dearth of court opinions in New Jersey and throughout the United States dealing with the measure of damages in an informed consent case. This opinion analyzes the appropriate measure of damages for the court to apply in this informed consent case.
The complaint in the instant case is couched in terms of malpractice. Those allegations in the complaint that refer to defendant doctor (oral surgeon) as having deviated from accepted medical standards in the performance of the operation were abandoned prior to the commencement of the trial. Plaintiff has proceeded to trial on the remaining allegations of deviation from accepted medical standards in negligently failing to obtain an informed consent to the operation. Defendant signed a standard hospital consent form at St. Elizabeth's Hospital which recites that plaintiff was informed of all risks of the proposed surgery, and consents to the operation. It is plaintiff's contention that defendant doctor did not, in fact, advise him of the risk of medial nerve damage inherent in the operation. Plaintiff has testified that if he had known that there was any risk in the proposed operation, he would have withheld his consent. Defendant, on the other hand, testified that he disclosed the risk of medial nerve damage to plaintiff. While defendant has no specific recollection of the conversation with plaintiff, he testified that it was and is his usual custom to notify all patients who undergo this type of operation of the risk of possible medial nerve involvement.
Plaintiff, 46 years old, had a ninth-grade education in Cuba prior to immigrating to the United States. He had had all of his teeth removed sometime in the past and complained of extreme difficulty in eating or speaking because there was no way for his dentures to adhere to the jawbone that was flat. His protruding lower jaw resulted in his upper and lower teeth not properly coming together, causing an abnormal bite. This condition was congenital. He also had suffered from a pre-existing *320 psychiatric problem which had resulted in marital difficulties prior to seeing defendant. As a result of visits to dentists to rectify what was an intolerable condition with respect to his chewing food and being able to speak, he was told that the only operation that would remedy the condition would be a surgical correction of mandibular prognathism and atrophy of the mandibular alveolar bone. On this basis, he came to see defendant oral surgeon who, after performing requisite x-rays and examination, concurred that this was what should be done and agreed to perform the operation.
The risk, which is the subject of this lawsuit, involves the medial nerve which lies in a channel of the jaw within which the contemplated surgery would be performed. Damage to the nerve need not result either from a touching or cutting of the nerve, but can be caused merely from the proximity of the nerve to the area of the operation. The damage can be caused by hematoma or scarring in the general area of the nerve.
It is undisputed by both parties' experts that the operation was properly performed and improved the conditions for which the operation was undertaken. However, there was resultant permanent sensory loss of the medial nerve extending from the midline of his chin off to the left, and protruding slightly above the left lateral portion of his lower lip. The area measures approximately three centimeters in length and one and a half to two centimeters in width. Plaintiff alleges that he has had post-operative marital problems because he does not want to be kissed by his wife because of the numbness, and that he is angry in general because he is left with the numbness above described.
Informed consent is a negligence concept in which in a medical-legal context, a physician has breached his duty to disclose a risk which a reasonable practitioner would have disclosed to a patient. If there is a finding of proximate cause, i.e., that the operation would not have taken place if the risk had been disclosed, then if the risk materializes and the patient *321 suffers resultant harm, the physician is liable.[1] The damage that defendant is liable for is the subject of this opinion.
In Perna v. Pirozzi, 92 N.J. 446, 459 (Sup.Ct. 1983) (quoting Canterbury v. Spence, 464 F.2d 772, 780 (D.C. Cir.1972), cert. den. 409 U.S. 1064, 93 S.Ct. 560, 34 L.Ed.2d 518 (1972)) the Court stated that informed consent "is a negligence concept predicated on the duty of the physician to disclose to a patient information that will enable him to `evaluate knowledgeably the options available and the risks attendant upon each' before subjecting that patient to a course of treatment." Id. at 459; citations omitted. See also Skripek v. Bergamo, 200 N.J. Super. 620, 633 (App.Div. 1985), certif. den. 102 N.J. 303 (Sup.Ct. 1985).
In the case at bar, it is conceded that there was no option of treatment available to the patient to alleviate his dental complaints other than the operation. The benefit that was sought by the patient to alleviate his dental condition could not be achieved without the collateral risk of damage to the medial nerve. The benefits sought and the collateral risk in this case are inseparable by the inherent nature of the operation.
The informed consent doctrine is the creation of equity, growing out of the doctor/patient relationship. The patient, ignorant of medicine, places his trust in the doctor to provide beneficial medical treatment. The patient does not know the relative merits of the options available or risks of treatment. The doctor is under a duty not only to obtain the patient's consent, but to inform the patient of any risks that a reasonable medical practitioner would disclose under the same or similar circumstances.
As stated in Canterbury v. Spence, supra, "the very purpose of the disclosure rule is to protect the patient against consequences *322 which, if known, he could have avoided by foregoing the treatment." 464 F.2d at 790. Therefore, since "... physicians are invariably acting in good faith and for the benefit of the patient,"[2] if the patient is benefitted by the operation, there is no basis for damages. Ibid.
The maximum exposure that the doctor is liable for in an informed consent case is the risk that materializes. This is in contrast to a battery where a patient recovers damages for all of the complications of an operation. In Perna v. Pirozzi, supra, the Court was dealing with a battery where the patient consented to surgery by one surgeon and actually was operated on by another. The Court stated:
If an operation is properly performed, albeit by a surgeon operating without the consent of the patient and the patient suffers no injuries except those which foreseeably follow from the operation, then a jury could find that the substitution of surgeons did not cause a compensable injury. Even there, however, a jury could award damages for mental anguish resulting from the belated knowledge that the operation was performed by a doctor to whom the patient had not given consent. Furthermore, because battery connotes an intentional invasion of another's rights, punitive damages may be assessed in an appropriate case. [92 N.J. at 461; emphasis supplied; citations omitted]
The Perna Court refers to Pugsley v. Privette, 220 Va. 892, 263 S.E.2d 69 (Sup.Ct. 1980), which was also a battery case. Plaintiff had been admitted to the hospital for pelvic bleeding. She expressed her opposition to being operated on unless her family doctor was present. Her family doctor did not come, but the surgeon chose to operate anyway. In the course of the operation her ureter was cut and she almost bled to death. The jury found that there was no negligence in the performance of the operation, but that since there was no consent to the operation, the surgeon was responsible for the injuries sustained. With respect to her injuries, the court, on appeal, held *323 that it was error for the trial court to have admitted proofs of her four-week wage loss following the operation because she would have sustained the same wage loss even if the operation had been performed without having cut the ureter. The Supreme Court of Virginia stated that:
... [T]he evidence is overwhelming that the all-pervasive complications, which accounted in large measure for plaintiff's damages, are those that resulted from the injury to the ureter. Since we believe the admission of the complained of testimony could not have altered the ultimate outcome of the case or had any material effect on the amount of the verdict, we hold that any error in its admission was harmless. [263 S.E.2d at 76]
In the case at bar, the cost of the operation (which was properly performed) would have been incurred whether there was or was not resultant nerve damage to the plaintiff. Plaintiff's offer of the medical bill into evidence is accordingly denied. Similarly, the pain and suffering that plaintiff would have incurred from the operation, with or without the resultant nerve damage, is not to be compensated for as damages in this case.
Since the only ill effect of the operation was the risk that materialized, the appropriate measure of damages is as set forth by the Supreme Court in Gleitman v. Cosgrove, 49 N.J. 22 (Sup.Ct. 1967) (cited with approval in Berman v. Allan, 80 N.J. 421, 428 (Sup.Ct. 1979)), where the Court stated: "The normal measure of damages in tort actions is compensatory. Damages are measured by comparing the condition plaintiff would have been in, had the defendants not been negligent, with the plaintiff's impaired condition as a result of the negligence." Id. at 28.
In an informed consent case the violation of duty consists of the physician's neglect to inform the patient of an inherent risk in the proposed operation. As a result of the violation of duty to disclose, the operation takes place. The condition to be compared in an informed consent case is (where the risk is the only complication of surgery) the condition that the patient would have been in without having the operation *324 and the condition that the patient is in after having had the operation. In a noninformed consent case, where the physician is negligent in the performance of an operation, the comparison is between the condition that the patient would have been in if the negligence had not taken place, and the condition that the patient has as a result of the physician's negligence. This is because it is the physician's negligence that has caused the injury. But for the physician's negligence, the operation could have been performed without any harm to the patient. In an informed consent case, where there are no alternatives of treatment, the operation could not have been performed without the inherent risk. Therefore, the comparison is between plaintiff's condition without having the operation and plaintiff's condition after having the operation.
In an informed consent case, it is only where "there is injury to the patient that makes the patient worse off (in financially measurable terms) than if the procedure had not been performed," that compensable damages should be allowed. Riskin, "Informed Consent: Looking for the Action," 1975 U.Ill.Law Forum 580, 585 (1975). Gleitman, supra, an informed consent case, was a suit for wrongful life and wrongful birth in which a child was born with birth defects because plaintiff had German measles during pregnancy. Defendant doctor did not advise plaintiff that it was possible that the child could be born with birth defects, allowing the mother the choice of aborting the pregnancy.
With respect to the wrongful life claim, it was plaintiff's assertion, on behalf of the child, that there should be damages for the impaired condition that the child was afflicted with as a result of being born. In applying the rule of compensatory damages, Justice Proctor stated,
The infant plaintiff would have us measure the difference between life with defects against the utter void of nonexistence, but it is impossible to make such a determination. The Court cannot weigh the value of life with impairments *325 against the nonexistence of life itself. [Gleitman v. Cosgrove, supra, 49 N.J. at 28.][3]
With respect to the parents' claim for damages for the birth of the inflicted child, the Court held that:
In order to determine their compensatory damages a court would have to evaluate the denial to them of the intangible, unmeasurable, and complex human benefits of motherhood and fatherhood and weigh these against the alleged emotional and money injuries. Such a proposed weighing is similar to that which we have found impossible to perform for the infant plaintiff. [Id. at 29.]
The Court was, in effect, applying the doctrine that where a wrong creates a benefit that would not have existed but for the wrong, the damages flowing from the wrong are offset to the extent of the benefit received. The benefits doctrine is appropriate in an informed consent case, since a collateral risk is an inherent part of the operation and the benefit could not have been achieved without the attendant risk. The parameters of this doctrine were enunciated in Sutherland, Damages, § 1056 (1916):
To entitle the defendant to show any incidental benefit to the plaintiff it must accrue directly from the act or business which causes or constitutes the nuisance and confer the benefit in the same manner as it operates to produce the injury; the allowance for benefits must be confined to the proximate consequence of the act complained of and be effects of like kind with the opposite injuries for which the recovery is sought. [at 3928]
See also Field, Damages, § 744 (1876), and McCormick, Damages 146 (1935).
This doctrine has also been applied in New Jersey in reducing the damages assessed where the doctor has deviated from the standard of care in the treatment of a patient.
In P. v. Portadin, 179 N.J. Super. 465 (App.Div. 1981), it was alleged that the doctor negligently performed a sterilization procedure resulting in the birth of a child. The Court, in *326 denying damages for the cost of raising and educating the child, relied upon Berman v. Allan, supra, and Gleitman v. Cosgrove, supra. In Berman, Justice Pashman stated:
In essence, Mr. and Mrs. Berman desire to retain all the benefits inhering in the birth of the child  i.e., the love and joy they will experience as parents  while saddling defendants with the enormous expenses attendant upon her rearing. Under the facts and circumstances here alleged, we find that such an award would be wholly disproportionate to the culpability involved, and that allowance of such a recovery would both constitute a windfall to the parents and place too unreasonable a financial burden upon physicians. [80 N.J. at 432; citations omitted]
Our Courts have determined as a matter of law (see n. 3 supra) that the normal costs of raising a child are outweighed by the love and affection received by the parents in wrongful birth cases. In applying the benefits doctrine, other jurisdictions allow the jury to determine the extent to which the benefits outweigh the costs of the wrongful birth. To that extent, the court, on this basis, in P. v. Portadin, supra, disapproved of Betancourt v. Gaylor, 136 N.J. Super. 69 (Law Div. 1975), Troppi v. Scarf, 31 Mich. App. 240, 187 N.W.2d 511 (Ct.App. 1971), and Custodio v. Bauer, 251 Cal. App.2d 303, 59 Cal. Rptr. 463 (Ct.App. 1967). In all three cases the birth would have been prevented if the doctor had not been negligent.
In Troppi v. Scarf, supra, plaintiff's doctor prescribed an oral contraceptive to insure that plaintiff would have no more children. The pharmacist, however, supplied plaintiff with a mild tranquilizer. Plaintiff became pregnant and brought suit against the pharmacist. The Court followed the Restatement, Torts, § 920, and held:
[I]f the defendant's tortious conduct conferred a benefit to the same interest which was harmed by his conduct, the dollar value of the benefit is to be subtracted from the dollar value of the injury in arriving at the amount of damages properly awardable. [Id. 187 N.W.2d at 518; footnote omitted]
In Custodio v. Bauer, supra, the cause of action was predicated on negligence. Plaintiff consulted defendants to be sterilized. The sterilization procedure was performed but plaintiff later became pregnant. Custodio, supra, citing Maben v. Rankin, 55 Cal.2d 139, 10 Cal. Rptr. 353, 358 P.2d 681 (Ca. *327 1961), states that, "[I]f the failure of the sterilization operation and the ensuing pregnancy benefitted the wife's emotional and nervous makeup, and any infirmities in her kidney and bladder organs, the defendants should be able to offset it." Custodio, supra, 59 Cal. Rptr. at 476.
Maben, supra, was an action against a medical clinic in which plaintiff's wife was involuntarily confined, and against the psychiatrist called in by the husband, for false imprisonment and assault and battery. The California Supreme Court stated that in determining the damages suffered as a result of the tortious act, consideration may be given, where equitable, to the value of any special benefit conferred by that act to the interest which was harmed.
Restatement, Torts 2d, § 920, entitled, "Benefit to Plaintiff Resulting from Defendant's Tort," sets forth that:
When the defendant's tortious conduct has caused harm to the plaintiff or to his property and in so doing has conferred a special benefit to the interest of the plaintiff that was harmed, the value of the benefit conferred is considered in mitigation of damages, to the extent that this is equitable.
Comment:
a. The rule stated in this Section normally requires that the damages allowable for an interference with a particular interest be diminished by the amount to which the same interest has been benefitted by the defendant's tortious conduct. [Id. at 509]
Cited thereunder is Mohr v. Williams, 95 Minn. 261, 104 N.W. 12 (Sup.Ct. 1905) (overruled on other grounds, Genzel v. Halvorson, 248 Minn. 527, 80 N.W.2d 854 (Sup.Ct. 1957)), in which plaintiff consulted with defendant physician complaining of trouble with her right ear. The physician examined both ears, but due to the presence of a foreign substance in the left ear, was unable to make a complete diagnosis. Plaintiff agreed to submit to the operation on her right ear. After being placed under anesthesia, the doctor made a thorough examination of her left ear and found it in a more serious condition than her right ear. He proceeded to operate on the left ear, and not on her right ear. The operation was skillfully performed. Plaintiff denied that her hearing in her left ear was impaired, and she denied that she consented to the operation. The court held that *328 whether plaintiff's consent should be implied as an emergency decision justifiable while the patient was under anesthesia was a jury question. If it was not authorized, it was wrongful and unlawful, and constituted an assault and battery.
However, the court held that the amount of recovery, if any, must depend on the character and extent of the injury inflicted on her and should also consider the beneficial nature of the operation, as well as the good faith of defendant.
The amount of plaintiff's recovery, if she is entitled to recover at all, must depend upon the character and extent of the injury inflicted upon her, in determining which the nature of the malady intended to be healed and the beneficial nature of the operation should be taken into consideration, as well as the good faith of the defendant. [Id. 104 N.W. at 16]
In determining proximate cause in an informed consent case, the jury is called upon to determine whether the operation would have taken place if the risk had been disclosed to the patient before the operation. If the jury assesses the potential outcome of the operation as beneficial, the physician should generally win on proximate cause. If, on the other hand, the jury concludes that the potential disability outweighs the potential benefit, the physician should lose on proximate cause. After the operation, utilizing the benefit rule, the jury in assessing damages can determine whether plaintiff was, in fact, benefited by the operation. It was the intention of plaintiff to better his condition. The thread throughout the cause of action for informed consent is that plaintiff should not lose the benefit of the operation because of an undisclosed risk. The risk that is an inherent part of the operation should not be separated out of context from the benefit received from the operation. Compensatory damages are designed to compensate a plaintiff for an actual loss. See Nappe v. Anshelewitz, Barr, Ansell & Bonello, 97 N.J. 37 (Sup.Ct. 1984); Reale v. Tp. of Wayne, 132 N.J. Super. 100 (Law Div. 1975); Ruff v. Weintraub, 105 N.J. 233 (Sup.Ct. 1987).
*329 The benefits doctrine has been applied in New Jersey to wrongful life and wrongful birth cases and accords with general principles of compensatory damages in tort actions. The benefits doctrine is uniformly endorsed in the literature as the appropriate measure of damages for informed consent cases.[4] Since informed consent is an equitable doctrine, the appropriate rule of damages can be molded by the court to fit the circumstances. "No rule of damages capable of precise application in all cases can be laid down and followed. The proper and just method varies with the facts of the particular case." Borbonus v. Daoud, 34 N.J. Super. 54, 60 (Ch.Div. 1955). Accord Demazo v. Wahby, 269 Md. 252, 305 A.2d 138, 142 (App.Ct. 1973).
The benefits doctrine, wherein complications of surgery are offset by benefits received from surgery, is in accord with the public policy of New Jersey. We take "judicial notice of the high esteem which our society accords to those in the medical profession." Berman v. Allan, supra, 80 N.J. at 430. The State is committed to preserving the health and lives of its citizens. Satz v. Perlmutter, 362 So.2d 160 (Fla. Dist. Ct. App. 1978). The medical community strives to maintain the health of society. See American Medical Ass'n, Principles of Medical Ethics (1982).
It is therefore the opinion of the court that if an operation is properly performed, of overall benefit to the patient, and there are no alternative options for treatment, there should be no compensable damages awarded against the physician. The court's charge will instruct the jury to subtract from the damages proximately caused by the nerve damage the benefits received from the operation.
NOTES
[1] Canterbury v. Spence, 464 F.2d 772, 790 (D.C. Cir.1972), cert. den., 409 U.S. 1064, 93 S.Ct. 560, 34 L.Ed.2d 518 (1972) (cited with approval in Dewes v. Indian Health Service, etc., 504 F. Supp. 203 (D.S.D. 1980)).
[2] Trogun v. Fruchtman, 58 Wis.2d 569, 207 N.W.2d 297, 313 (Sup.Ct. 1973). See also, Natanson v. Kline, 186 Kan. 393, 350 P.2d 1093, 1100, reh'g den. 187 Kan. 186, 354 P.2d 670 (Sup.Ct. 1960); Prosser, Torts (5 ed. 1971), § 18; McCoid, "A Reappraisal of Liability for Unauthorized Medical Treatment," 41 Minn.L.Rev. 381 (1957).
[3] Gleitman has been modified with respect to damages; see Berman v. Allan, supra, Schroeder v. Perkel, 87 N.J. 53 (Sup.Ct. 1981), and Procanik by Procanik v. Cillo, 97 N.J. 339 (Sup.Ct. 1984). Such modifications are in response to the constitutional right to privacy involved in a woman's right to an abortion and do not overrule the court's endorsement of the benefit concept.
[4] Riskin, "Informed Consent: Looking for the Action," 1975 U.Ill.Law Forum 580, 585 (1975); Waltz and Scheuneman, "Informed Consent to Therapy," 64 Nw.U.L.Rev. 628 (1970); Faden and Beauchamp, A History and Theory of Informed Consent, (1986). Note, "Informed Consent," 48 N.Y.U.L.Rev. 548, 550 (1973).