735 A.2d 620 (1999)
324 N.J. Super. 367
Annette GILMARTIN, Executrix of the Estate of Brian Gilmartin, and Annette Gilmartin, Individually, Plaintiff-Appellant/Cross-Respondent,
v.
Herman J. WEINREB, M.D., Defendant-Respondent/Cross-Appellant, and
Jeffrey S. Weinstein, D.O., S. Alan Weinstein, D.O., and Old Bridge Medical Associates, Defendants.
Superior Court of New Jersey, Appellate Division.
Argued April 26, 1999.
Decided August 27, 1999.
*622 Randall J. Richards, Woodbridge, for plaintiff-appellant/cross-respondent (Wilentz, Goldman & Spitzer, attorneys; Mr. Richards and Morris Brown, of counsel; John Anzalone, on the brief).
Cynthia A. Matheke, Roseland, for defendant-respondent/cross-appellant (Lum, Danzis, Drasco, Positan & Kleinberg, attorneys; Ms. Matheke, of counsel; Ms. Matheke and John P. Little, on the brief).
Before Judges D'ANNUNZIO, CUFF and COLLESTER.
*621 The opinion of the court was delivered by D'ANNUNZIO, J.A.D.
Plaintiff appeals from a judgment based on an adverse jury verdict in this medical negligence case. On April 12, 1993, Brian Gilmartin, then thirty-four, died due to an overdose of the drug colchicine. Colchicine therapy had been prescribed by defendant, Dr. Herman J. Weinreb, as a treatment for decedent's multiple sclerosis (MS). Dr. Weinreb's office was located in New York City, but the Gilmartins, Brian and his wife Annette, the plaintiff herein, lived in Monmouth County, New Jersey. For the Gilmartins' convenience, beginning in April 1992, Brian's weekly injections of colchicine were administered by Old Bridge Medical Associates (Old Bridge), a New Jersey medical group which included Dr. S. Alan Weinstein and his son, Dr. Jeffrey W. Weinstein. Old Bridge's physicians administered the drug to Brian every Saturday morning. Although Dr. Weinreb had recommended Dr. Menosh, a New Jersey physician experienced in the use of colchicine to treat MS, the Gilmartins selected Old Bridge because the Weinsteins had treated Mrs. Gilmartin and her family.
Colchicine is toxic when administered in greater than recommended doses, but when administered in nontoxic doses it alleviates some symptoms of MS. Defendant prescribed a weekly dose of 4 milligrams (4 mg), which is the maximum recommended weekly dose. In 1992 Eli Lilly & Company (Lilly), the only manufacturer of liquid colchicine, supplied it in ampules containing 0.5 mg per cc (a "cc" equals a milliliter). This translates into a concentration of 1 milligram (1mg) per every 2 milliliters (2 ml). Thus, Gilmartin's prescription required the injection of 8 ml (8 cc's) of colchicine.
In April 1993, the Gilmartins informed Dr. Weinreb that Old Bridge was having difficulty obtaining colchicine in liquid form. Apparently, Lilly had terminated the manufacture of colchicine for intravenous administration. To accommodate the Gilmartins, defendant had a batch of *623 liquid colchicine prepared by a pharmaceutical laboratory in Colorado. Defendant instructed the pharmacy to (a) prepare the colchicine in a new concentration of 2 mg per 1 ml, which was four times greater than the old concentration of 0.5 mg per 1 ml, and (b) package the colchicine in 30 cc vials, each containing 25 cc's of colchicine.
Upon receipt of these vials, defendant, on April 3, 1993, mailed one vial to Brian, along with a letter that said:
Enclosed is the intravenous colchicine prepared by the pharmacist.
PLEASE NOTE THIS IS 2MG PER ML. IT IS HIGHER CONCENTRATION THAN YOU HAVE BEEN TAKING.
The MAXIMUM DOSE PER INJECTION IS 4 MG OR 2 ML.
Please give this to your doctor.
At 9:30 a.m. on April 10, 1993, Brian arrived at Old Bridge's office for his weekly colchicine injection, and delivered the vial and letter. Martha Schikschneit, a medical assistant, prepared Gilmartin's medication in a syringe with a 10 cc capacity, and Dr. S. Alan Weinstein injected it.
By 3:00 p.m. on April 10, 1993, Brian began to feel ill. At 4:30 p.m. on Monday, April 12, 1993, he suddenly stopped breathing, and he was pronounced dead at his home at 4:50 p.m. The cause of death was multi-organ dysfunction due to the toxic effects of colchicine. The evidence leads to the irresistible conclusion that Weinstein had injected Brian with at least 4 ml (8 mg) of colchicine, 2 times the prescribed dose, and perhaps as much as 8 ml (16 mg), which would have been 4 times the maximum safe dosage.
In her complaint, plaintiff, Annette Gilmartin, Brian's wife, alleged negligence by Old Bridge and the Weinsteins for giving Brian a toxic overdose of colchicine on April 10, 1993, and for not disclosing the overdose to defendant, Dr. Weinreb, when he telephoned Jeffrey Weinstein on the morning of April 12, 1993. Plaintiff alleged negligence by Dr. Weinreb for not recommending the immediate hospitalization of Brian after plaintiff informed him of Brian's symptoms by telephone on the morning of April 12, 1993.
During the trial, the Weinsteins settled with plaintiff. Following this settlement, plaintiff pressed a claim of lack of informed consent against defendant, alleging that he never had informed Brian of the risks of a colchicine overdose.
The jurors answered "no" (8-0) to verdict sheet question 1:
RE: INFORMED CONSENT
1. Did the Plaintiff prove by a preponderance of the credible evidence that Dr. Weinreb failed to give any warning regarding the IV Administration of Colchicine?

YES___ NO___

Vote___
If "Yes" to Question No.1, proceed to Question No.2.
If "No" you have determined Dr. Weinreb was not responsible under the theory of liability. Go to Question No.4
The jurors answered "no" (6-2) to verdict sheet question 4:
RE: NEGLIGENCE
4. Did the Defendant Dr. Weinreb deviate from accepted standards of medical practice in his care of Brian Gilmartin in failing to hospitalize or monitor him on Monday, April 12, 1993?

YES___ NO___

Vote___
If your answers are "No" to Questions No.1,2,3 and also Question No.4. Return your verdict.
Plaintiff filed no motion for a new trial. On April 13, 1998, the judge entered a judgment in favor of defendant.
*624 Informed Consent
Plaintiff contends the trial court erred in several respects regarding the informed consent claim. Arguably, plaintiff's contentions are valid. We do not reach them, however, because we conclude that a physician has no duty to inform a patient of the risk of negligent treatment.[1] Therefore, the trial court should not have submitted an informed consent issue to the jury.
In Largey v. Rothman, 110 N.J. 204, 540 A.2d 504 (1988), our Supreme Court, relying on Canterbury v. Spence, 464 F.2d 772 (D.C.Cir.), cert. denied, 409 U.S. 1064, 93 S.Ct. 560, 34 L.Ed.2d 518 (1972), reformulated the elements of a medical negligence action based on the lack of informed consent. Under Largey, plaintiff must establish that the risk of the injury which plaintiff claims to have sustained as a result of medical treatment would have influenced a prudent patient in reaching a decision on whether to undergo the treatment. If so, then the physician deviated from informed consent standards if the physician had not advised plaintiff of that risk. Id. at 212-14, 540 A.2d 504. Additionally, plaintiff must establish causation. Causation is established if a prudent person in the patient's position would have declined treatment if he had been informed adequately of the risk that resulted in harm. Largey, supra, 110 N.J. at 216, 540 A.2d 504.
As explained in Canterbury, supra, 464 F.2d 772, the physician must only disclose the "inherent and potential hazards of the proposed treatment." Id. at 787. In addition, the "unrevealed risk that should have been made known must materialize," the "[o]ccurrence of the risk must be harmful to the patient," and a causal connection must exist between the physician's failure to disclose "risks incidental to [the] treatment" and the patient's injury, and does so exist only when disclosure of the "inherent and potential hazards of the proposed treatment" would have resulted in the patient "foregoing the treatment." Id. at 787, 790.
The disclosure standard is the same in New Jersey. The physician must only disclose the "risks associated with the proposed treatment" and "dangers associated with ... [the] proposed course of treatment." Calabrese v. Trenton State College, 162 N.J.Super. 145, 156-57, 392 A.2d 600 (App.Div.1978), aff'd, 82 N.J. 321, 413 A.2d 315 (1980). As explained in Battenfeld v. Gregory, 247 N.J.Super. 538, 589 A.2d 1059 (App.Div.1991):
Informed consent is a negligence concept predicated on the duty of a physician to disclose to a patient information that will enable him to consider and weigh knowledgeably the options available and the risk attendant to each.... Under the doctrine, the patient who consents to an operation is given the opportunity to show that the physician withheld information concerning the inherent and potential hazards of the proposed treatment, the alternatives, if any, and the results likely if the patient refuses the prescribed course.

[Id. at 550-51, 589 A.2d 1059.]
See Matthies v. Mastromonaco, 160 N.J. 26, 733 A.2d 456 (1999) (holding that physician has duty to explain risks of noninvasive treatment, bedrest, as well as alternatives to that treatment); Gracia v. Meiselman, 220 N.J.Super. 317, 323, 531 A.2d 1373 (Law Div.1987) ("In an informed consent case the violation of duty consists of the physician's neglect to inform the patient of an inherent risk in the proposed operation."); Block v. McVay, 80 S.D. 469, 126 N.W.2d 808, 812 (1964), overruled on other grounds, Shamburger v. Behrens, 380 N.W.2d 659, 663 (S.D. 1986) ("[A] doctor owes a duty to his patient *625 to make known to such patient or someone acting for him the known dangers inherent ... in the treatment proposed so that the patient will be in a position to make an intelligent decision as to whether he will submit to the course the physician proposes to take.").
In the present case, decedent's injury was not the result of a risk inherent in the proposed treatment. It was caused by the negligence of a third party or parties in administering the drug. This case should be contrasted with Calabrese, supra. There, plaintiff had received an anti-rabies vaccine because the dog which had bit him was never found and, therefore, could not be tested. Although Calabrese did not contract rabies, he was affected with certain neurological side effects which were a known risk of the vaccine, even when properly administered. 162 N.J.Super. at 150, 392 A.2d 600. There was evidence that the treating physician had not advised Calabrese of those inherent risks.
A physician, however, is "not responsible for failing to disclose a risk" which is "not inherent in the procedure," and a physician "need not discuss a risk of the improper performance of an appropriate procedure." 61 Am.Jur.2d Physicians, Surgeons, and Other Healers § 191 (1981). In the case of a drug, an "inherent risk" of the drug is "one which exists in and is inseparable from the drug itself." Barclay v. Campbell, 704 S.W.2d 8, 10 (Tex.1986). For example, "tardive dyskinesia is an inherent risk associated with neuroleptic drugs," in that tardive dyskinesia "arises from the use of the drug and not from any defect in the drug or negligent human intervention." Ibid.
In the case of a "medical procedure," a "risk inherent in the medical procedure performed" means that the "risk is one which exists in and is inseparable from the procedure itself." Jones v. Papp, 782 S.W.2d 236, 240 (Tex.App.1989). For example, "surgery" is not a "risk inherent" in the "purely investigative or diagnostic procedure known as coronary angiography," because "surgery is not an intended part of the coronary angiography procedure." Id. at 240-41.
A physician owes his or her patient a duty to disclose the "dangers inherent... in the treatment proposed" so that the patient will be in a position to make an intelligent decision whether or not to submit to the course of treatment that the physician "proposes to take." Block v. McVay, supra, 126 N.W.2d at 812. By the same token, because the informed consent doctrine is "concerned with instances of performance of treatments recognized to have inherent and probable substantial risks associated with them," a physician does not have a duty to disclose the "risks of the improper performance of an appropriate procedure" or the "dangers in the procedure if not done properly." Mallett v. Pirkey, 171 Colo. 271, 466 P.2d 466, 470-71 (1970). See Tajchman v. Giller, 938 S.W.2d 95, 100 (Tex.App.1996) (because the "disclosure requirement" is limited to the "consequences of a proposed medical procedure, exclusive of the means by which that procedure is performed," the doctrine of informed consent "requires that only inherent risks that result from the medical procedures performedand not defects or steps in the procedure itselfmust be disclosed"); Holt v. Nelson, 11 Wash.App. 230, 523 P.2d 211, 219 (1974) ("A doctor need not disclose a risk of the improper performance of an appropriate procedure.").
In Mull v. Emory University, Inc., 114 Ga.App. 63, 150 S.E.2d 276 (1966), a hospital-employed laboratory technician performed an "improper injection" of Bromsulphalein, "a dye ... usually and customarily injected into a patient's bloodstream through a vein" as part of a "diagnostic test known as a `BSP' test." Id. at 279, 282, 292. The laboratory technician "improperly administered the injection" of Bromsulphalein, in that she "did not insert the point of the needle of... [the] syringe into the vein of the *626 plaintiff's arm, but rather she did insert the point thereof into the surrounding soft tissue" of the plaintiff's arm. Id. at 284, 292. While the needle was inserted into the flesh of the plaintiff's arm, "local swelling appeared in the immediate vicinity of the point of insertion of said needle in the tissue surrounding the point of insertion," which was "caused by the injection of said Bromsulphalein solution into the soft tissues of plaintiff's arm." Id. at 284.
The Georgia Court of Appeals upheld the hospital's demurrer to the plaintiff's allegation of "failure to warn of the hazard of an improper injection" by its laboratory technician:
Briefly stated, this rule [of informed consent] is that a consent to a treatment or diagnostic test obtained without disclosure of the hazards or dangers involved, is no consent. Whether or not the "informed consent" rule is applicable in this State, such rule, if applicable, applies only to the duty to warn of the hazards of a correct and proper procedure of diagnosis or treatment, and has no relation to the failure to inform of the hazards of an improper procedure.

[Id. at 292.]
See Martin v. Stratton, 515 P.2d 1366 (Okla.1973) (holding that doctrine of informed consent does not include the hazards of improper procedure); see also Backlund v. University of Washington, 137 Wash.2d 651, 975 P.2d 950, 956 (1999) (observing that a misdiagnosis is a matter of medical negligence, but does not fall within principles of informed consent); Pratt v. University of Minnesota Affiliated Hospitals & Clinics, 414 N.W.2d 399, 401-02 (Minn.1987) (holding that principles of informed consent do not require a physician to inform a patient that a diagnosis may be incorrect).
In the present case, plaintiff argues that a physician has an obligation to advise the patient about the "nature of the proposed procedure or treatment," and about "all risks, not some or any, all risks, side effects and effects of said treatment." Plaintiff also contends that defendant did not inform "Mr. Gilmartin of various risks and side effects of the Colchicine treatment including its toxicity and poisonous nature and the symptoms associated with overdose, and that an overdose could be fatal." Finally, plaintiff argues that, "at the time the Colchicine therapy was initiated" by defendant in April 1992, "no disclosure was made to them that Colchicine was extremely poisonous and toxic."
The April 1992 "Guidelines For Intravenous Colchicine Therapy," prepared by defendant and given to the Gilmartins in material part, said:
The recommended dose of intravenous colchicine ranges between 1-4 mg ... by vein each week.... The maximal single dose of intravenous colchicine must not exceed 4 mg in a 24 hour period.
Here, the therapy proposed by defendant was "weekly injections of 4 mg. Colchicine." Defendant had informed Gilmartin of the risks associated with 4 mg. of IV colchicine therapy.
Plaintiff contends that defendant violated his duty by not disclosing that colchicine is "extremely poisonous and toxic." But plaintiff acknowledged below, and acknowledges again on appeal, that colchicine is a "substance that is toxic" only "when administered in greater than recommended doses." See, e.g., Equitable Life Assurance Society v. Hemenover, 100 Colo. 231, 67 P.2d 80, 82 (1937) ("Luminal, when properly used, is a medicine, valuable in the treatment of nervousness, etc., but taken in overdoses is a poison and lethal."). See also L.A. Sharp, Annotation, Malpractice: Physician's Liability for Injury or Death Resulting from Side Effects of Drugs Intentionally Administered to or Prescribed for Patient, 47 A.L.R.5th 433, 449 n. 4 (1997) ("A side effect may be a known risk inherent in the use of a drug, or it may consist of rare or entirely unexpected reactions resulting from allergy or *627 other physiological idiosyncrasy of the patient. As used herein, the term `side effect' does not include reactions of the kind often accompanying overdose of a drug.").
Defendant acknowledged that "every medication has side effects," and that "every medication ... has toxicity and overdose effects," i.e., "toxic overdose effects." However, defendant noted that colchicine is not "poisonous in its recommended dose." Plaintiff's expert witnesses agreed with that statement.
A physician's mistaken intravenous administration of colchicine in an amount double the prescribed dosage is not a risk inherent in a treatment modality requiring the intravenous administration of colchicine at its safe maximum dosage of 4 mg. We are persuaded that, in the absence of exceptional circumstances, a physician has no duty to inform a patient of the risk of negligent treatment. Negligence can arise in such a rich variety of circumstances and contexts that a physician cannot anticipate and define all eventualities for a patient. Merely to advise a patient of the general risk of negligence by a physician, nurse, or technician is inadequate to the purposes of the informed consent rule which is to provide the patient with the ability to "evaluate knowledgeably" the available options and attendant risks. Perna v. Pirozzi, 92 N.J. 446, 459, 457 A.2d 431 (1983). Similarly, a general warning of negligence would pose difficulties in establishing causation, i.e., that the patient would have made a different decision if adequately informed. Moreover, we impute constructive knowledge to all patients that a negligent act by a caregiver can cause injury, whether the negligent caregiver is a surgeon, pharmacist, nurse or ambulance driver.
Physician's Judgment
Plaintiff contended below that Dr. Weinreb misdiagnosed Brian's condition on Monday, April 12 and that defendant should have hospitalized Brian that morning. As previously indicated, the jury rejected plaintiff's liability theory. Plaintiff argues that the court erred in its instructions regarding a physician's exercise of judgment, particularly its instruction regarding a physician's liability in the event of a "mistake." We precede our discussion of this issue with a summary of the relevant evidence.
Annette Gilmartin testified that when Brian returned from the Old Bridge office on Holy Saturday he told her that he thought he had received an overdose of colchicine. Brian had a degree in chemical engineering from Stevens Institute of Technology as well as a Masters Degree in finance. According to Annette, Brian told her that the syringe was filled "to about what it usually was," but he thought it should be less[2] as a result of the higher concentration provided by Dr. Weinreb. Dr. Weinstein's nurse, Martha, and Dr. Weinstein had assured Brian that everything was "okay."
Annette testified that several hours after the April 10 injection, Brian experienced stomach pains, nausea and diarrhea. He began to vomit and was in bed or in the bathroom for the rest of the day and all night, actually sleeping on the floor next to the bathroom door.
By Easter Sunday morning, the vomiting and diarrhea had stopped, but Brian stayed in bed all day. Annette testified that Brian had an elevated temperature and "looked terrible." Brian did not leave his bedroom Sunday, although Annette hosted an Easter dinner for their families.
Sunday evening Annette called Dr. Weinreb's office and left a message with an answering service. Geraldine Allen, defendant's nurse, returned Annette's call *628 that night. Annette testified that she told Allen about Brian's symptoms and that Brian believed he had received an overdose. According to Annette, Allen said it sounded as if Brian had received too much medicine and advised Annette to give Brian lots of fluids.
Geraldine Allen's deposition was read to the jury. Allen received two phone calls from Annette on Easter Sunday evening. Annette told Allen at 7:00 p.m.:
Brian is very nauseous, vomiting, very weak. Annette told me Brian went to Dr. Weinstein on Saturday for an injection of colchicine. Brian told Dr. Weinstein the dosage was too much. He never got that much. I asked Annette if she gave the letter of instructions to the doctor before he was given the injection. She said yes. I told her to keep Brian quiet til morning and I would get Dr. Weinreb to call in the a.m. She told me Brian was in bed all day Easter Sunday.
According to Allen, Annette declined Allen's offer to call Dr. Weinreb, saying that "she just wanted me to be aware of the call; that it was not an emergency." Allen had also suggested that Annette take Brian to an emergency room since Brian "was fatigued and weak and that he had been vomiting." Annette responded that Brian did not want to go.
Allen also testified:
At 10 p.m. I had gotten a call. I don't remember if I called her or she called me. I got the call. She told me that he was still very weak and then I asked her if he had eaten anything. And, you know, she said no. I said to just keep him quiet. I said, but I would advise you, you know, do you want me to call Dr. Weinreb? She said, Geri-that's when she told me about the dosage. She said that he was very angry. And I could hear him in the background yelling and I said, Annette, let me talk to Brian. So she put him on the phone and he was angry because he had gottenhe had gone to Dr. Weinstein's office and had gotten the injection of colchicine. And he was angry because he says he kept yelling at the nurse and the doctor, to Dr. Weinstein, that they never got that much. I never asked the dosage. I didn't know.
Again Brian declined Allen's offer to call Dr. Weinreb, telling Annette "no, I'm okay, but just make sure he knows everything."
Defendant called Annette the next morning. Each testified to sharply different versions of their conversations. According to Annette, she described for Dr. Weinreb a substantial list of symptoms, including rapid heartbeat, dilated pupils, shallow breathing, bluish tinge to his skin and clammy skin. Annette testified defendant told her that Brian had received an overdose of colchicine and that defendant had confirmed an overdose with Dr. Weinstein. Annette told the jury Dr. Weinreb informed her there was no antidote, there was nothing to do except give Brian fluids and that Brian would have to "ride it out."
Dr. Weinreb testified that when he called Annette on Monday morning, she told him about Brian's vomiting, nausea and diarrhea but she stated that those symptoms had subsided and that Brian had showered that morning though he was weak and would not be going to work. Annette expressed concern about the dosage. She wanted defendant to verify with Dr. Weinstein that the proper dosage had been given. Dr. Weinreb called Old Bridge and spoke with Dr. Jeffrey Weinstein who said that his father, Alan, had given the injection but that Alan was not available. Jeffrey, however, checked the chart and informed defendant that Brian had received 4 mg. of colchicine, the correct dosage. Dr. Weinreb instructed Jeffrey to reduce the dosage to 3 mg. for the next injection because defendant was concerned that Brian was developing an intolerance for the drug.
After his conversation with Jeffrey Weinstein, defendant called Annette and told her that Brian had received the correct *629 dosage. According to defendant, Annette said that Brian had eaten cereal, was taking fluids and seemed to be better. Dr. Weinreb testified that Annette never mentioned that Brian had difficulty breathing and had a rapid heartbeat. He denied telling her that Brian had received an overdose and would have to "ride it out."
Dr. Weinreb agreed that an overdose of colchicine could be fatal and would constitute a medical emergency requiring hospitalization and management of the patient's symptoms. He testified that he initially had suspected that Brian had received an overdose, but he rejected that diagnosis based on several factors. One of the factors was Jeffrey Weinstein's assurance that the chart reflected an injection of 4 mg. Another factor was the absence of vomiting and diarrhea by Monday morning. Additionally, Annette had reported that Brian was improving, i.e., he had showered and eaten some cereal. Dr. Weinreb testified that if Brian had received an overdose, he would have been getting progressively worse; instead, he was improving.
Plaintiff presented experts in the use, effect and toxicity of colchicine. They agreed that the 4 mg dosage prescribed by Dr. Weinreb was appropriate. They agreed that an overdose of colchicine was potentially fatal at levels above 7½ mg, that dosage being the lowest dosage known to have caused a death. The experts, and the medical examiner who performed the autopsy testified that a colchicine overdose had killed Brian due to multiple organ dysfunction.
Dr. Robert Rodvien testified there is no antidote for colchicine toxicity. The patient must be hospitalized and placed in intensive care for management and treatment of symptoms and support of cardiac and respiratory function. According to Dr. Rodvien, the cessation of vomiting and diarrhea within 24-36 hours after an overdose does not signify improvement because the bowel becomes paralyzed as a result of colchicine toxicity during that time period. According to Dr. Rodvien, Dr. Weinreb deviated from the applicable standard of care by not referring Brian to a physician or hospital "to be seen, evaluated and treated." Dr. Rodvien testified that if Brian had been hospitalized on Monday morning, "it's more probable than not, that his life would have been saved" and that the failure to hospitalize Brian increased the risk of death.
Dr. Norman Ertel testified that Brian received a minimum dosage of 8 mg of colchicine. Dr. Rodvien opined that Brian had received 10 mg.
Dr. D'Angelo testified as an expert witness for defendant, and supported defendant's position that the symptoms reported by Annette did not justify a diagnosis of colchicine overdose.
The trial judge used the version of Model Jury Charge 5.356(A) in effect in March 1998 when the case was tried. It instructs the jury that a physician is not liable for a diagnosis or treatment resulting from the physician's exercise of judgment. Our Supreme Court addressed this instruction in Morlino v. Medical Center of Ocean County, 152 N.J. 563, 706 A.2d 721 (1998), decided the day after the Gilmartin trial began. The Court affirmed the appropriate role of a jury instruction recognizing "the critical role of judgment" in the practice of medicine. Id. at 587, 706 A.2d 721. Substantively, the Court recognized:
In selecting among alternative treatments, however, the doctor must exercise his or her judgment and select from alternatives that are objectively reasonable. The selection of an alternative that is objectively unreasonable would violate the doctor's duty of care to the patient.

[Id. at 583-84, 706 A.2d 721.]
The Court, however, found the following sentence in the Model Charge to be problematic:

*630 The physician cannot be held liable if, in the exercise of his judgment, he nevertheless made a mistake.

[Id. at 588, 706 A.2d 721.]
We shall refer to this sentence as the "mistake sentence." Regarding the "mistake sentence" the Court observed:
The danger is that the sentence could be construed to mean that an honest, but mistaken, exercise of judgment insulates the physician from liability for a mistake that violates a relevant standard of care. A mistake, however, connotes an instance in which the physician violates such a standard of care. Consequently, a physician who fails to abide by an objective standard of care is subject to liability even if the failure results from the exercise of judgment.

[Id. at 589, 706 A.2d 721.]
Despite its criticism of the "mistake sentence," the Court affirmed the judgment in favor of the defendant physician. It agreed with the Appellate Division that the Model Charge, "when read in its entirety, does not have the capacity to mislead the jury." Id. at 589, 706 A.2d 721. Nevertheless, the Court referred the Model Charge to the Supreme Court Committee on Model Jury Charges, Civil, to review Model Jury Charge 5.36(A). Regarding the "mistake sentence," the Court ordered the Committee to eliminate it "because of its potential to confuse the jury." Id. at 590, 706 A.2d 721.
In the present case, the trial judge, despite plaintiff's objections, included the "mistake sentence" in its instructions regarding a physician's judgment. In doing so, the trial judge relied on the Supreme Court's conclusion in Morlino that the charge in its entirety was not misleading.
Cases, however, must be decided on their facts. The facts in Morlino included "compelling evidence that [defendant] Dr. Dugenio conformed to prevailing medical standards by carefully weighing the risk of administering Cipro [Ciprofloxacin] against its benefits." Id. at 576, 706 A.2d 721.[3] In other words, the Court deemed use of the "mistake sentence" to be harmless in the circumstances of that case. In the present case, we conclude that in the face of compelling evidence of Dr. Weinreb's deviation the "mistake sentence" had the capacity to confuse the jury and tip the scales in defendant's favor. Additionally, the jury instruction regarding a physician's judgment was given in the abstract without an attempt to relate the principles of law to the evidence in the case. See Brough v. Hidden Valley, Inc., 312 N.J.Super. 139, 146, 711 A.2d 382 (App.Div.1998); Vallejo by Morales v. Rahway Police Dept., 292 N.J.Super. 333, 342, 678 A.2d 1135 (App.Div.), certif. denied, 147 N.J. 262, 686 A.2d 763 (1996). We are persuaded, therefore, to reverse and remand for a new trial.
Brian had received colchicine injections for approximately one year, almost 52 of them, with only limited side effects. For the first time since defendant began treating Brian in 1989, the Gilmartins reached out for Dr. Weinreb on a Sunday night, Easter Sunday. On Monday morning, Dr. Weinreb was informed that Brian, a person with a degree in chemical engineering, believed he had received an overdose. Brian's belief was based on his observation of the amount of fluid in the syringe. Defendant also was informed that Brian experienced symptoms consistent with an overdose. The fact that these events occurred the first time the Weinsteins injected Brian using the higher concentration should have alerted Dr. Weinreb to the probability that the Weinsteins had erred.
Defendant admitted that he suspected an overdose, but ruled it out in part because *631 Dr. Jeffrey Weinstein had assured defendant that Brian had been given the appropriate dosage. A jury could have determined that Dr. Weinstein's assurances were virtually worthless. An overdose would have been inadvertent and the Weinsteins would not necessarily know whether they had given Brian a double dose.
Dr. Weinreb testified that he also relied on the cessation of vomiting and diarrhea and Annette's statement that Brian had showered, eaten cereal, and was feeling better. Plaintiff's expert testified that cessation of vomiting and diarrhea does not signify improvement in the case of a colchicine overdose. Rather, it means that the patient is entering the second phase of colchicine poisoning.
The alternatives facing Dr. Weinreb on Easter Monday were no treatment, which he chose, or referral to a local physician or hospital for a hands-on clinical examination of Brian in light of the history of suspected colchicine poisoning. The point is, that the alternative not selected was not dangerous or invasive and carried little, if any, down-side risk.
On this evidence, a jury could have determined that where the stakes were survival or death, Dr. Weinreb made a "mistake." The jury was told, however, that a physician who exercises judgment is not liable for a mistake, and thereby could have been misled.
We also observe that the jury instruction was delivered in the abstract. Relating the principles of law to the evidence and the fact determinations the jury had to make might have alleviated the impact of the mistake sentence. The trial court should have instructed the jury regarding the conflict between defendant and Annette about the content of their conversations on Easter Monday. The jury should have been instructed to determine from the evidence what was said at that time, and then to evaluate defendant's conduct. The jury also should have been instructed to evaluate Dr. Weinreb's conduct, even if the jury rejected Annette's credibility in this regard. Such an instruction would have avoided a verdict based solely on the jury's determination that in her testimony Annette had embellished her Easter Monday conversations with Dr. Weinreb.[4]
The jury should have been instructed that it had to determine whether it was objectively reasonable for defendant to have ignored Brian's belief that he had been overdosed. Brian's belief was not based solely on his symptoms; it was based on his observation, as a chemical engineer, of the amount of fluid in a 10 cc syringe.
The jury should have been instructed whether it was objectively reasonable for defendant to have relied on Dr. Jeffrey Weinstein's assurance regarding the dosage administered to Brian.
Undoubtedly, Brian's rejection of Allen's suggestion that Brian go to an emergency room and his instruction not to call Dr. Weinreb Easter Sunday could support an inference that Brian did not consider his condition to be serious. Such an inference would tend to corroborate Dr. Weinreb's testimony regarding Brian's symptoms as reported to him, and to corroborate Dr. Weinreb's judgment as to the severity and significance of Brian's symptoms. However, the Gilmartins did not know that an overdose could be lethal. A jury could determine that their ignorance diluted the significance of Brian's reluctance to go to an emergency room or speak with defendant on Sunday night.
*632 Additionally, the expert's testimony that cessation of vomiting and diarrhea did not mean improvement was potentially significant evidence. If deemed credible, a jury could have concluded that Dr. Weinreb had misunderstood the information he admitted getting and relying on.
Plaintiff's contention that the instruction regarding a physician's judgment should not have been given is without merit. Plaintiff accused Dr. Weinreb of an improper diagnosis of Brian's condition on Easter Monday. Except in the unusual case, diagnosis requires an exercise of judgment. This is such a case. See Aiello v. Muhlenberg Regional Medical Center, 159 N.J. 618, 733 A.2d 433 (1999) (noting that "our courts consistently have limited the application of the `exercise of judgment' charge to medical malpractice actions concerning misdiagnosis or the selection of one of two or more generally accepted courses of treatment" (159 N.J. at 628-29, 733 A.2d 433)).
Informed Consent Revisited
We now readdress informed consent. We have rejected plaintiff's theory that defendant failed to get Brian's informed consent to colchicine therapy in 1992 because he did not tell Brian that Colchicine could be lethal if he accidently received an overdose. Although plaintiff did not raise it, an informed consent issue lurks in Dr. Weinreb's "treatment" of Brian on Easter Monday.
In April 1992, when defendant placed Brian on colchicine therapy, defendant was treating Brian for multiple sclerosis. On Easter Monday, 1993, however, the Gilmartins consulted Dr. Weinreb regarding Brian's acute physical condition and his suspicion that he had received an overdose of colchicine. Defendant marshaled the available information, made a diagnosis ruling out colchicine overdose and, based on that diagnosis, formulated a treatment plan. The treatment plan was to see Brian sometime that week.
Dr. Weinreb conceded that he never told the Gilmartins that a colchicine overdose was potentially lethal. None of the written material defendant gave Brian informed him of colchicine's lethality. The issue is whether Dr. Weinreb had a duty on Easter Monday to disclose to the Gilmartins the fact that an overdose can be lethal and that if Brian had received an overdose the treatment would be immediate hospitalization in an attempt to manage the symptoms of colchicine poisoning. Armed with that information, and in light of his initial suspicion that he had been given too much medicine, Brian may have rejected Dr. Weinreb's "treatment" plan and opted for the alternative treatment of immediate hospitalization.
We are reluctant to rule on this issue because we have raised it sua sponte and it has not been briefed. Moreover, such a duty would be equivalent to requiring a physician to advise a patient of a diagnosis not made. Courts considering such a duty have rejected it. See Backlund v. University of Washington, 137 Wash.2d 651, 975 P.2d 950, 956 (1999) (observing that a misdiagnosis is a matter of medical negligence, but does not fall within principles of informed consent); Pratt v. University of Minnesota Affiliated Hospitals & Clinics, 414 N.W.2d 399, 401-01 (Minn.1987) (holding that principles of informed consent do not require a physician to inform a patient that a diagnosis may be incorrect). The present case may be distinguishable, however, because here the patient, a chemical engineer, presented an overdose hypothesis and the circumstances established a well-grounded suspicion that the patient was correct.
On the other hand, disclosure of the drug's lethality in the event of an overdose may be the equivalent of informing a patient of available alternative diagnostic *633 techniques. See Keogan v. Holy Family Hospital, 95 Wash.2d 306, 622 P.2d 1246, 1252-53 (1980) (holding that physician had duty, in face of acute abnormality, "to inform the patient of potentially fatal causes of his abnormality and the means of ruling out or confirming this source of illness.").
We leave further consideration of this issue to the parties and the trial court.
United States Pharmacopoeia
Plaintiff contends the judge "erred in refusing to take judicial notice and in prohibiting plaintiff to establish through expert testimony that the United States Pharmacopoeia (USP) is the standard of care for formulation, packaging and shipment of Colchicine" and, as a result, he "wrongfully dismissed plaintiff's negligence claim" against defendant for "improperly packaging and shipping" to Gilmartin a "higher concentration of Colchicine in a multi-dose vial ... contrary to guidelines established in the USP for Colchicine."
Plaintiff relies specifically on the following language in the USP regarding liquid colchicine:
Caution  Colchicine is extremely poisonous. Packaging and storage  Preserve in single-dose containers, preferably of Type I glass, protected from light.
Plaintiff argues that the USP established a standard applicable to Dr. Weinreb's use of multi-dose containers and that the purpose of the USP single-dose container standard was to prevent an overdose. The trial court refused to submit this issue to the jury because none of plaintiff's expert witnesses so testified. The only testimony in the record regarding the applicability of this USP standard was from Dr. Weinreb on plaintiff's cross-examination. He testified that the USP applied to drug manufacturers and pharmacists, but not to practicing physicians. He denied that prevention of overdose is the rationale behind the single-dose container requirement.
We affirm the trial court's ruling. In Morlino, supra, the Court also addressed the admissibility of pharmaceutical package inserts reproduced in the Physician's Desk Reference (PDR). The Court held that the package inserts and the PDR are admissible to establish a physician's standard of care when supported by expert testimony. Morlino, supra, 152 N.J. at 579-82, 706 A.2d 721. We are persuaded that the Court's reasoning applies to the USP.
The judgment in favor of Dr. Weinreb is reversed and the case is remanded for a new trial.
NOTES
[1] Defendant cross-appeals from the trial court's determination to submit the informed consent issue to the jury.
[2] The colchicine was administered with 2cc of another drug. Using the old concentration, Brian had received 8cc of colchicine and 2cc of the other drug, filling a 10 cc syringe. Under the new concentration Brian should have received a total of 4cc of fluid. Dr. Weinstein used a 10 cc syringe. It should have been less than half full.
[3] Ciprofloxacin is an antibiotic Dr. Dugenio prescribed for Ms. Morlino to treat a "sore throat" which a throat culture had indicated was the result of Hemophilus influenza bacteria which is resistant to other antibiotics. Plaintiff alleged that the drug killed her fetus.
[4] During cross-examination of Annette by counsel for Old Bridge and the Weinsteins, it was established that Annette had retained counsel within a few hours after Brian's death. In the absence of unusual circumstances, this line of questioning should not be permitted on retrial since the potential for undue prejudice is substantial.